# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

WALTER MITCHELL,

       Plaintiff,

vs.                                            No. CIV 05-1155 JB/LAM

THE BOARD OF COUNTY COMMISSIONERS OF
THE COUNTY OF SANTA FE and DENNIS
O'BRIEN,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiff Walter Mitchell's Request for Hearing in Lieu of Affidavit of Amount Due for Default Judgment, filed April 11, 2006 (Doc. 7)("Request for Hearing"). The Court held a hearing on this request on June 16, 2006. The primary issues are: (i) whether the Court should grant Mitchell a hearing at which a monetary amount due may be calculated; (ii) whether Mitchell must serve notice of the hearing to assess damages upon Defendant Dennis O'Brien; (iii) whether Mitchell may unilaterally withdraw his jury demand solely for the purpose of conducting an evidentiary hearing to assess damages against O'Brien; and (iv) what amount of damages the Court should award. Because the Court believes a hearing is necessary to properly quantify the damages in this case, the Court held a hearing to assess the amount of damages on June 16, 2006. The Court also concludes that, because O'Brien has not responded in any way to service, Mitchell and the Court need not give O'Brien further notice of the hearing. Because the Court does not believe, however, that Mitchell may unilaterally withdraw his jury demand for the purposes of assessing damages against O'Brien, the Court will not award damages at this time. The

Court will grant Mitchell's request in part and deny it in part.

## FACTUAL BACKGROUND

Mitchell represents that, on or about November 4, 2002, O'Brien shot him from behind three times. See First Amended Complaint for Civil Rights Violations ¶ 11, at 3, filed April 20, 2006 (Doc. 13)("Amended Complaint"). On November 2, 2005, Mitchell filed a Complaint alleging various civil rights violations against the City of Santa Fe and O'Brien. See Complaint for Civil Rights Violations, filed November 2, 2005 (Doc. 1)("Complaint"). On April 20, 2006, Mitchell amended his Complaint to replace the Defendant City of Santa Fe with Defendant Board of County Commissioners of the County of Santa Fe and to correct the spelling of O'Brien's name. See Amended Complaint at 1. Both Mitchell's Complaint and Amended Complaint include a demand for a jury trial on all counts so triable. See Complaint at 8; Amended Complaint at 8.

Mitchell asserts that service on O'Brien is reliable because O'Brien is still an active duty deputy sheriff with the Santa Fe County Sheriff's Department and another deputy sheriff of the same department served O'Brien. See Transcript of Hearing at 43:20-24 (Montoya)(taken June 16, 2006)("Transcript").[1] A return of service for the original Complaint was executed for service upon O'Brien and for service upon the City of Santa Fe. See Return of Service, filed December 29, 2005 (Doc. 3); Return of Service, filed November 16, 2005 (Doc. 2). No return of service was filed in association with Mitchell's Amended Complaint. No Defendant has entered an appearance or filed a response in this matter.

On April 11, 2006, Mitchell filed a motion for default judgment against O'Brien. See Motion

---

[1]The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

and Application for Default Judgment, filed April 11, 2006 (Doc. 6)("Motion for Default Judgment"). The following day, April 12, 2006, the Clerk of the Court entered default of O'Brien.  <u>See</u> Clerk's Entry of Default, filed April 12, 2007 (Doc. 10).  On May 9, 2006, the Court entered an order granting Mitchell's application for default judgment.[2]  <u>See</u> Order on Plaintiff's Motion for Default Judgment, filed May 9, 2006 (Doc. 15).

## <u>PROCEDURAL HISTORY</u>

As a result of the default judgment entered against O'Brien, Mitchell requests the Court set a hearing at which a monetary amount due to Mitchell may be calculated.  <u>See</u> Request for Hearing. Mitchell's counsel represents that he is unable to provide a fixed monetary amount without a hearing in this case.  <u>See</u> <u>id.</u>

Mitchell did not serve O'Brien with a notice of the hearing on damages.  On May 6, 2006, however, the Court filed a Notice of Hearing indicating that it would hold a hearing to assess the amount of damages on May 17, 2006.  <u>See</u> Notice of Hearing, filed May 6, 2006 (Doc. 14).  On May 17, 2006, the Court filed an order granting Mitchell's motion to continue the damages hearing until June 16, 2006.  <u>See</u> Motion to Continue Hearing for May 17, 2006, filed May 15, 2006 (Doc. 16); Order Continuing Hearing Set for May 17, 2006, filed May 17, 2006 (Doc. 17).  Both the Court's

---

[2]The first paragraph of the form of order that Mitchell submitted for the Court's authorization incorrectly indicates that the matter came "before the Court on Plaintiff's application for default judgment against Defendant Russell Fleming."  Order on Plaintiff's Motion for Default Judgment, filed May 9, 2006 (Doc. 15).  The second paragraph of the order, however, states that "Defendant Dennis O'Brian is liable to Plaintiff, as the party prevailing herein."  <u>Id.</u>  Mitchell's filings requesting default judgment all request that the court enter default judgment against O'Brien, not Fleming.  <u>See</u> Praecipe, filed April 11, 2006 (Doc. 9); Motion for Default Judgment.  Fleming is not a party to this action, and the Court does not believe that he has been referenced in any other pleading or filing. Accordingly, the Court construes its May 9, 2006 Order to grant Mitchell default judgment against O'Brien.

May 6, 2006 Notice of Hearing, and its May 17, 2006 Order continuing the hearing, were properly added to the Court's docket in this case. The Court held a hearing on June 16, 2006 at which Mitchell presented evidence regarding the amount of his damages in the form of his own testimony, and the testimony of an economics expert. O'Brien did not respond to the Court's notice of hearing and did not appear at the hearing.

At the June 16, 2006 hearing, the Court asked Mitchell about his jury demand and whether the Court should empanel a jury to hear his damages issues. See Transcript at 44:18-24 (Court). Before presenting evidence at the June 16, 2006 hearing, Mitchell's counsel stated that Mitchell withdrew his jury demand for the purposes of the hearing. See id. at 45:1 (Montoya). Mitchell asserted that, if O'Brien subsequently makes an entry of appearance, he reserves the right to renew his jury demand. See id. at 45:2-3.

### 1.    Expert Testimony.

At the June 16, 2006 hearing, Mitchell presented testimony from William Jennings Patterson, III, a forensic economist. See id. at 45:24-25; 46:7-8 (Patterson). Patterson has been the sole proprietor of the firm, Legal Economics, since 2000 and has been employed at the firm since 1986. See id. at 46:13-15. Patterson has a bachelor's degree in economics, and has testified as an expert in state and federal courts in New Mexico and Texas. See id. at 46:21-22. Specifically, Patterson has testified as an expert concerning the economic value of: (i) medical expenses, see id. at 47:9-10; (ii) lost enjoyment of life, see id. at 48:2-6; (iii) lost household services, see id. at 48:11-13; and (iv) lost earnings, see id. at 48:21-23.

### a.    Incurred and Future Medical Expenses.

A summary of Mitchell's medical expenses related to the shooting incident underlying this

case indicates that Mitchell has already incurred $50,148.76 in related medical expenses.  See Plaintiff's Damages Hearing Exhibits, Exhibit 2, Related Medical Expenses and Payment Summary at 2 ("Related Expenses Summary").  This figure represents costs incurred for services from the following providers: (i) St. Vincent Hospital; (ii) Santa Fe Orthopedic Clinic; (iii) Psychological Consultants; (iv) University of New Mexico Hospital; (v) Santa Fe Imaging/Santa Fe Radiology; and (vi) University Physician Associates. See id. at 1-2.

Patterson calculated the present value of $1,000.00 per year for recurring future medical expenses across Mitchell's life expectancy.  See Transcript at 54:10-12 (Patterson).  Based on Mitchell's current age of forty-three years old, and using a life expectance of seventy-seven years of age,  Patterson determined that the present value of $1,000 per year for medical expenses is $36,133.00. See id. at 54:12-13.  Patterson explained that this value -- $36,133.00 -- is the amount of money that would have to be deposited today for Mitchell to withdraw $1,000.00 worth of medical expenses each and every year through his seventy-seventh year of age, and for, at the conclusion of that period, all the principle, and interest that deposit would earn, to be consumed. See id. at 66:3-9. Patterson testified that the interest rate he applied in his calculation was the return on high grade municipal bonds and tax-free instruments of that nature. See id. at 66:12-13.  Patterson did not offer any conclusion regarding what Mitchell's annual medical expenses might be, or the difference between Mitchell's reasonably expected expenses and those of an average, healthy forty-three year old male. See id. at 54:19-55:1.

Patterson also calculated the estimated present value of Mitchell's future hip replacement surgeries. See id. at 52:16-19.  Patterson based his computation on Mitchell's representation that he would need a new hip replacement every ten years; assuming a life expectance of seventy-seven years,

Patterson assumed Mitchell would need hip replacement surgery three times.  In calculating the present value of the cost of those surgeries, Patterson used figures -- that Mitchell provided -- that the surgery in ten years would cost $15,000.00, the surgery in twenty years would cost $25,000.00, and the surgery in thirty years would cost $40,000.00.  See Transcript at 52:13-19 (Patterson). Patterson determined that the present value of the costs of these surgeries is $97,048.00.  See id. at 55:24.

### b.    Household Services.

Based on a life expectancy for Mitchell of seventy-seven years, Patterson calculated the value of one hour per day of household services at $103,643.00.  See Plaintiff's Damages Hearing Exhibits, Exhibit 4, at 1.  To reach this figure, Patterson used the federal minimum wage of $5.15 per hour for 2002-2004.  See Transcript at 56:15-18 (Patterson).  For 2005, he used a figure of $6.00 per hour, because "the minimum wage has not risen in over ten years, and it is becoming impossible now to hire people for only $5.15 an hour to do all the kind of household service we need."  Id. at 56:17-24.  For the years 2006 and beyond, Patterson used $8.00 per hour -- the minimum wage that the City of Santa Fe recently enacted.  See id. at 56:24-57:1.  Patterson did not offer any conclusion regarding how much household service Mitchell has lost as a result of this injury.  See id. at 56:4-7.  He did testify, however, that, based on statistics that economists commonly use, an average man performs "a little more than one hour per day of household services."  See id. at 56:12-13.

### c.    Pleasure of Life.

Patterson testified economists consider a variety of methodologies in calculating the lost value of pleasure of life.  First, Patterson indicated that economists often consider the cost of various safety devices, such as child-safety seats for automobiles, building smoke alarms, and fire detectors, and

compare those costs to the number of lives those devices save and the ages of those lives to reach a "roundabout" determination of how lives are valued in terms of safety. Id. at 57:19-58:2. Second, Patterson explained that economists consider how individuals in dangerous occupations are compensated compared to others in less dangerous positions with similar vocational requirements and physical stresses, i.e., policemen, firemen, and underground miners versus security personnel, maintenance personnel, and heavy equipment operators. See id. at 58:18-25. Third, Patterson described the method that federal agencies employ when determining whether to promulgate new regulations. Patterson explained that agencies estimate the cost of imposing new regulations, the number of lives that the new regulations can be expected to save, and demographic data such as the age and gender of those lives to calculate figures that can be used to represent life values. See id. at 59:6-23. The final method that Patterson considered involves an economic-opportunity cost analysis. See id. at 59:24-25. Patterson explained that economists divide an individual's average daily income by the number of hours in the individual's work day to determine the value of a working hour, and then rely on the assumption that the remaining hours -- excluding those used for sleep or household services -- have a worth approximately equivalent to a working hour. See id. at 59:25-60:5.

Patterson testified that, in calculating the present value of lost value of life, it is his practice to calculate a benchmark similar to the figures he calculated related to medical expenses and household services. See id. at 60:17-21. Patterson calculated that the present value of each $10,000.00 per year lost is $363,245.00. See id. at 61:2-5. Patterson did not, however, calculate the specific value for any pleasure of life Mitchell may have lost; Patterson expressed that, in his opinion, this valuation is an issue for the finder of fact. See id. at 60:21-25. Patterson also stated that he did not compute any value for Mitchell's pain and suffering, because economists do not have a

marketplace or a reliable statistical study to base such calculations.  See id. at 61:21-62:2.

        **d.**      **Earning Capacity.**

Patterson calculated the present value of lost earning capacity for an average male college graduate with Mitchell's life expectancy based on various percentages of loss of earning capacity. See Plaintiff's Damages Hearing Exhibits, Exhibit 4, at 1; Transcript at 62:13-18 (Patterson). Patterson calculated figures based on a 10%, 25%, 50%, 75%, and 100% loss of earning capacity, and based on retirement ages of 62, 65, and 77 years old. See Plaintiff's Damages Hearing Exhibits, Exhibit 4, at 1; Transcript at 62:17-23 (Patterson). Patterson explained that about half of the men in Mitchell's age group retire at about age sixty-two, that sixty-five is the normal retirement age, and that seventy-seven is his life expectancy. See Transcript at 63:7-14 (Patterson).

At the extreme low end, Patterson calculated that, if Mitchell were to have lost only 10% of his overall earning capacity, and was to work until age sixty-two, the present value of the amount lost would be $168,688.00. Conversely, if Mitchell were to have lost 100% of his earning capacity, and worked until age seventy-seven, the present value of the amount lost would be $2,814,358.00. See Plaintiff's Damages Hearing Exhibits, Exhibit 4, at 1; Transcript at 63:16-22; 64:9-14 (Patterson). The following is a representation of the chart that Patterson prepared:

| Retirement Age | Percentage Loss | | | | |
|---|---|---|---|---|---|
| | **100%** | **75%** | **50%** | **25%** | **10%** |
| **62** | $1,686,875.00 | $1,265,157.00 | $843,439.00 | $421,719.00 | $168,688.00 |
| **65** | $1,925,895.00 | $1,444,421.00 | $962,947.00 | $481,474.00 | $192,589.00 |
| **77** | $2,814,358.00 | $2,110,768.00 | $1,407,179.00 | $703,589.00 | $281,436.00 |

See Plaintiff's Damages Hearing Exhibits, Exhibit 4, at 1.  Patterson testified that he had no idea

-8-

where Mitchell's injuries would fall within this chart. <u>See</u> Transcript at 64:15-18 (Patterson). Patterson noted that, if Mitchell had no earning capacity before suffering his injury, or if the injury did not cause any loss of earning capacity, then he has not suffered a loss. <u>See</u> <u>id.</u> at 64:20-25. Patterson asserted that the finder of fact must determine Mitchell's actual earning capacity before the injury and the percentage loss in earning capacity the injury caused. <u>See</u> <u>id.</u> at 65:2-3.

### 2. <u>Mitchell's Testimony</u>.

During his testimony at the damages hearing, Mitchell asserted that, while he is not formally trained in medicine, he is "somewhat self-trained," he studied neurology and other related subjects while pursuing a psychology degree, and he is therefore "conversant." <u>Id.</u> at 74:24-75:2 (Mitchell). Mitchell indicated that he received first-aid emergency training while working as a structural mechanic in the Navy, and had completed part of an Emergency Medical Technician course. <u>See</u> <u>id.</u> at 75:9-14. Mitchell also represented that he "casually" studied Chinese medicine. <u>Id.</u> at 95:13-14.

### a. **Incurred and Future Medical Expenses.**

Mitchell testified that an unknown benefactor paid the bill for his initial hip replacement and hospitalization bill -- an amount which he indicated was approximately $26,000.00. <u>See</u> <u>id.</u> at 86:19-23; Related Expenses Summary at 1 (listing charges for medical services at St. Vincent's Hospital at $25,689.25). Mitchell acknowledged that he has not done an ideal job of tabulating his medical expenses since being released from jail. <u>See</u> <u>id.</u> at 86:25-87:1.

Mitchell stated that, since being released from jail, he has undergone two surgeries. The first was a reconstructive surgery to repair the shattered radius in his left forearm. <u>See</u> <u>id.</u> at 87:1-3. The second surgery was to remove the bullet from his right hand. <u>See</u> <u>id.</u> at 87:3-4.

Mitchell explained that, in the almost two months it took him to get out of jail, schedule a

medical appointment, and have the surgery on his left forearm, a significant amount of scar tissue had formed that complicated the surgery.  See id. at 88:13-18.  The shattered portion of Mitchell's radius was replaced with a bone graft from his hip, plates were bolted over the bone graft to hold the components in place while the arm healed, and Mitchell's arm was placed in a large cast from knuckles to biceps.  See id. at 88:23-89:5.

Mitchell contends that his arm is not right after the reconstructive surgery and that the potential of a revisionary surgery should be considered when projecting his future medical expenses. See id. at 89:7-12.  Mitchell indicated that there is some muscle atrophy in his arm, and that the radius is almost an inch shorter than it used to be.  See id. at 89:15-17.  He represented that his wrist joint is now seriously misaligned.  See id. at 89:18-19.  Mitchell testified that, subsequent to this surgery, his ability to perform manual labor and to stay in shape through activities such as weight lifting has been severely compromised.  See id. at 90:1-5 ("[I]t's been just devastating in that respect.").  He stated that, while he believes the initial reconstructive surgery requires revision, he has not been satisfied with surgical solutions that doctors with which he has consulted have proposed.  See id. at 90:8-11.  Nevertheless, Mitchell estimated that, if the revisionary surgery was performed in the near future, the cost would be approximately $50,000.00.  See id. at 99:4-6.

Mitchell testified that he has been receiving acupuncture treatments and Chinese medical herbal treatments to maintain functionality and to minimize the impact of his injuries.  See id. at 94:16-19.  Mitchell asserted that these treatments had been highly effective and had made a significant difference in his general mobility.  See id. at 94:20-22; 95:19-21.  Mitchell stated that these treatments cost $75.00 per visit and that he is visiting four times per month.  See id. at 94:22-25.

Mitchell indicated that he is currently forty-seven years old and that he has calculated the costs

of future medical expenses based on a life expectancy of eighty-five years.  See id. at 96:8-9.  He

calculated that, based on the current rate of $75.00 per visit and assuming four visits per month, the

cost of thirty-nine years of acupuncture and herbal treatment would be $140,400.00.  See id. at

96:10-13.

Mitchell disagreed with Patterson's estimates regarding the costs of his future hip

replacements.  Mitchell contended that revisionary surgery on his hip would be significantly more

complex than his first hip replacement, because his femur would have to be split to remove the

prosthesis that was inserted into the bone during the original hip replacement.  See id. at 97:7-11.

Accordingly, Mitchell proffered a "guesstimate" that the first revision would cost $60,000.00.  Id.

at 97:23-25.  Mitchell further estimated that the second revision might cost $120,000.00, and that the

third could cost $240,000.00.  See id. at 98:8-10.  Mitchell based his estimates on his assumption that

the cost of medical services will continue to rise "at the astonishing rate they have been doing for the

past couple of decades," that "we're on the very brink of an inflationary episode," and that the

surgeries in the future will be "complex and complicated" procedures "where we may expect

everything to be a whole lot more expensive than it is now."  Id. at 98:3-15.

### b.    Household Services.

Mitchell testified that he is not married, and that he does not have anyone who regularly stays

with him or helps him care for his household.  See id. at 91:3-11.  Mitchell acknowledged that he is

not "such a great housekeeper," but that he does "construction work and repair and revision work."

Id. at 91:15-16.  He stated that his ability to perform heavy lifting or to engage in physical

maintenance has been "severely impaired."  Id. at 91:18-21.

Mitchell described himself as an "inventor and a general handyman."  Id. at 93:8-9.  He

-11-

asserted that, as part of his daily routine, he would spend as much as three or four hours a day in his home workshop cleaning, moving items, setting up new projects, and dismantling old projects. See id. at 93:9-12. Mitchell represented that, currently, after three to four hours, one of his three impaired limbs is malfunctioning and he must desist from physically demanding labor. See id. at 93:15-21. Accordingly, he estimated that he has lost between three to four hours per day of household services that he previously performed before his injuries. See id. at 93:22-24.

### c. Pain and Suffering.

Mitchell testified that he was shot three times; the first bullet passed through his right wrist, the second bullet passed through his right forearm, and the third bullet passed into his left buttock and out through his left groin. See id. at 73:10-14. Mitchell stated that he lost consciousness a few seconds after being shot and that he woke up in the emergency room in a highly agitated emotional state. See id. at 75:23-25. Mitchell represented that he was then given anaesthesia and that, when he next awoke, his hip had been replaced without his granting consent to the operation. See id. at 76:2-4. Mitchell explained that, while his arms had been splinted, no attempt was made to repair any damage to them. See id. at 76:4-5. Specifically, the bullet had not been removed from his right wrist, and none of the compound fractures in his left forearm had been addressed. See id. at 76:5-8. Mitchell stated that, when he awoke from the anaesthesia, he was under guard in a private room and his ankles were shackled. See id. at 81:13-14. At that time, he was informed that he was accused of assaulting a police officer. See id. at 81:14-15.

Mitchell contended that, after approximately three days in the hospital, he was sent to the Santa Fe County jail where he was placed in medical confinement. See id. at 81:17-23; 82:12-13. Mitchell testified that he did not receive any physical therapy while in jail, that he received minimal

-12-

antibiotic treatment, and that the jail was in short supply of drugs, painkillers, bandages, and other first-aid supplies.  See id. at 81:24-82:24.  Mitchell described the pain associated with movement during this period as "excruciatingly painful" and characterized it as the worst pain of his life.  Id. at 83:17-22; 84:20-24.

Mitchell explained that the most intense pain levels lasted for about two weeks, and that the minimum rehabilitative resources available in jail exacerbated his problems.  See id. at 85:1-8.  He asserted that he still experiences daily pain which is, at best, "minimal," but which, at worst, is "quite severe" and "half as bad as the initial pain."  Id. at 85:9-86:3.  Mitchell described a variety of painful irritation and discomfort associated with his hip replacement.  He stated that the range of movement in his hip is "somewhat limited," that there is a loss of muscle control, that the hip is generally sore and irritable, and that it tends to get inflamed.  See id. at 77:25-78:5.  Mitchell represented that, while he experiences constant discomfort in his hip, from time to time he is subject to very painful sessions where -- because of muscle fatigue or inflammation -- he loses rotational control over his lower leg.  See id. at 78:24-79:5.  Mitchell explained that he has learned to avoid these more severe episodes by curtailing his physical activity and remaining close to home when he is compelled to walk.  See id. at 79:22-80:7.

Mitchell testified that, to assist him in valuating his pain and suffering, he consulted articles from the Internet and learned treatises on calculating economic values that his counsel provided him.  See id. at 99:18-22.  Mitchell organized his analysis into two categories -- pain and emotional distress -- and attempted to itemize the distinct pains and emotional distresses he suffered.

Under the category of pain, Mitchell listed the pain associated with: (i) the initial gunshot wounds, see id. at 100:16-17; (ii) the surgeries to date, see id. at 100:17-18; (iii) the difficulty and

discomfort in obtaining proper functioning of the affected joints to date, see id. at 100:18; (iv) future

difficulty and discomfort in obtaining proper functioning of the affected joints, see id. at 100:18-19;

(v) inherent pain and discomfort from an impaired ability to exercise and maintain fitness; (vi)

cardiovascular deterioration and musculoskeletal deterioration from reduced physical activity, see id.

at 101:3-12; and (vii) aggravation of all the aforementioned factors resulting from poor and delayed

medical care, see id. at 101:13-22.  Under the category of emotional distress, Mitchell testified that

his acupuncturist, whom he described as his "de facto psychologist," diagnosed him as suffering from

a disassociative syndrome.  Id. at 102:2-8.  He indicated that this syndrome is a coping mechanism

often accompanied by memory loss which prevents him from thinking about or focusing on issues

related to his injuries for any meaningful length of time.  See id. at 102:8-12; 103-24.  Mitchell

attested that he also suffers from frustration, relative depression, significant apathy, and impairment

of his ability to interact socially in a manner that he is often unable to recognize himself, but which

others notice and bring to his attention.  See id. at 102:21-25.  Mitchell also  indicated that he has

previously been labeled a hypochondriac, that he pays "meticulous attention" to his health issues, and

that he is a "very vain individual."  Id. at 103:7-10.  Finally, Mitchell stated that he was unable to

philosophically separate lost enjoyment of life from emotional distress and therefore accounted for

the former in his calculation of the latter.  See id. at 106:12-19.

Mitchell concluded that the value of his pain and suffering was $300.00 per day.  See id. at

103:18.  Mitchell explained that, while his pain may have initially been greater than it is now and may

increase as he ages, this figure was an attempt to arrive at a "guesstimate for an average" value for

the rest of his life.  Id. at 104:1-18.  He calculated that, after thirty-seven years, the total value of his

pain and suffering would be $5,250,500.00.[3]  See id. at 105:1.

### d.    Earning Capacity.

Mitchell testified that, based on the work he used to perform before his injury, which he described as "generally physically demanding," the injuries caused him to lose 70% of his earning capacity. Id. at 105:20-25.  Mitchell stated that, in his current self-employment as an inventor, he plans to work until he dies.  See id. at 106:3-4.  Accordingly, he asserted that, if he accepted the actuarial life expectancy figures that Patterson used -- which he argued were pessimistic and not in line with his familial expectations -- he would expect to work up to seventy-seven years.  See id. at 106:4-7.

## ANALYSIS

The Court has carefully reviewed the evidence that Mitchell presented in support of his request for damages.  Two issues, however, present themselves.  The Court has not had the benefit of any briefing by Mitchell on these issues, and the Court has not had the benefit of an adversarial process.  The Court's conclusion on the second issue precludes an award of damages at this time.

## I.    MITCHELL WAS NOT REQUIRED TO SERVE O'BRIEN NOTICE OF THE DAMAGES HEARING.

Mitchell served his original Complaint on O'Brien and a return of service was executed and filed with the Court.  O'Brien has not appeared in any capacity in this case.  Although the Court filed a Notice of Hearing informing any person who reviewed the docket that it would hold a hearing on damages, and filed an Order alerting any person who reviewed the docket to the revised hearing date when it granted Mitchell's motion to continue the original hearing, neither Mitchell nor the Court

---

[3]The Court is not certain how Mitchell calculated this figure.  The Court notes that $300.00 per day multiplied by 365 days per year multiplied by 37 years equals $4,051,500.00.

served O'Brien with Notice of the damages hearing.  Mitchell maintains O'Brien has been given adequate opportunity to appear in this case and that he is not required to serve additional notice regarding the damages hearing.  See id. at 44:3-12 (Montoya).  Mitchell contends that O'Brien "has been given every opportunity to enter an appearance . . . [and] will continue to have that opportunity even after the outcome of [the damages] hearing."  Id. at 44:12-16.

When a court must determine the amount of damages after a default judgment, rule 55(b)(2) of the Federal Rules of Civil Procedure authorizes the court to "conduct such hearings or order such references as it deems necessary and proper and shall accord a right of trial by jury to the parties when and as required by any statute of the United States."  Fed. R. Civ. P. 55(b)(2).  Rule 55 is silent, however, regarding whether a defendant who has failed to appear is entitled to notice of a hearing to assess damages.

The United States Court of Appeals for the Tenth Circuit has held that "a court may not enter a default judgment without a hearing unless the amount claimed is a liquidated sum or one capable of mathematical calculation."  Venable v. Haislip, 721 F.2d 297, 300 (10th Cir. 1983).  The Tenth Circuit in Venable v. Haislip did not, however, discuss what notice, if any, must be served on a defaulting defendant with respect to a damages hearing.  Mitchell has not cited, and the Court has not discovered in its independent research, any Tenth Circuit or Supreme Court authority directly addressing this question.

Courts are in disagreement whether a defendant is entitled to notice of a hearing to assess the amount of damages after a default judgment has been entered.  Compare Pierce v. Anglin, 721 So. 2d 781, 783 (Fla. Ct. App. 1998)("Where an action involves unliquidated damages, a party against whom a default has been entered is entitled to notice of an order setting the matter for trial, and must

be afforded an opportunity to defend."); <u>Bonner v. Am. Fin. Mktg. Corp.</u>, 434 A.2d 323, 324 (Conn. 1980)(requiring notice of a damages hearing to a defendant against whom a default judgment had been entered on the issue of liability because the liability judgment "did not prevent [the defendant] from raising defenses, on proper notice, at a hearing in damages"), <u>with</u> <u>Pogia v. Ramos</u>, 876 P.2d 1342, 1346 (Haw. Ct. App. 1994)(holding that there is no requirement to serve notice of proof-of-damages hearing upon a defaulted party who has failed to appear in the action); <u>Dynasteel Corp. v. Aztec Industries, Inc.</u>, 611 So. 2d 977, 981 (Miss. 1992)(holding that defaulted defendant who failed to appear was not entitled to notice of damages hearing).   <u>See</u> B. Finerg, Annotation, <u>Defaulting Defendant's Right to Notice and Hearing as to Determination of Amount of Damages</u>, 15 A.L.R. 3d 586 (1967)(collecting cases).   Courts that have determined that defaulted defendants are not entitled to notice, however, have frequently emphasized whether the defendant ever made an appearance  in the action.   <u>See</u> <u>Town & Country Kids, Inc. v. Protected Venture Inv. Trust</u>, 178 F.R.D. 453, 455 (E.D. Va. 1998)( "[I]f a defaulting party has not appeared in the action, no notice is required.").

Focusing on whether a defendant has ever made an appearance in an action allows courts to attribute meaning to the language of rules pertinent to default judgments and service of filings.  Rule 55(b)(2) provides that, "[i]f the party against whom judgment by default is sought has appeared in the action, the party . . . shall be served with written notice of the application for judgment at least 3 days prior to the hearing on such application."  Fed. R. Civ. P. 55(b)(2).  At least one court has reasoned that this language leads to the corresponding conclusion that, if a party has not appeared, no notice is necessary.  <u>See</u> <u>Town & Country Kids, Inc. v. Protected Venture Inv. Trust</u>, 178 F.R.D. at 455.  This interpretation of the notice requirement is also consistent with rule 5(a), which provides that "[n]o service need be made on parties in default for failure to appear except that pleadings

asserting new or additional claims for relief against them shall be served upon them in the manner provided for service of summons in Rule 4." Fed. R. Civ. P. 5(a).

Mitchell served his Complaint on O'Brien and a return of service was executed.  Mitchell attests that this service was reliable, because O'Brien remains a officer with the Santa Fe County Sheriff's Department and another officer in the Department served O'Brien. See Transcript at 43:20-24 (Montoya).  Accordingly, O'Brien should be cognizant of Mitchell's claims against him and has been informed of his obligation to respond.

Absent more express instruction from the Tenth Circuit, the Court will not impose upon Mitchell a notice obligation that the rules and the caselaw do not.  O'Brien was given notice of this case, and all of the pertinent events and filings have been properly and timely added to the Court's docket.  Although the Court always prefers to conduct proceedings with the participation of both parties in the context of adversarial hearings, it also acknowledges that this case has moved along deliberately -- Mitchell filed his Complaint in November 2005 -- and that O'Brien has had adequate time to enter an appearance in response to Mitchell's cause of action.  At this point in the proceedings, the Court will not prohibit Mitchell from advancing his case because O'Brien has not appeared to defend.

## II.     MITCHELL MAY NOT UNILATERALLY WAIVE HIS JURY DEMAND FOR THE PURPOSE OF THE DAMAGES HEARING.

Rule 38(d) provides that, once made, "a demand for trial by jury . . . may not be withdrawn without the consent of the parties." Fed. R. Civ. P. 38(d).  Mitchell contends that, because O'Brien has not appeared in this case, Mitchell is authorized to withdraw his jury demand for the purposes of the evidentiary hearing on damages, and reserves his right to renew his jury demand if either of the

named defendants enter an appearance in this action. See Transcript at 44:25-45:3 (Montoya).

In Barber v. Turberville, 218 F.2d 34 (D.C. Cir. 1954), the United States Court of Appeals for the District of Columbia Circuit reviewed a case in which, after a default judgment was entered against a defendant who never made an appearance in the case, the plaintiff withdrew her jury demand for the purposes of assessing damages without serving notice on the defendant. See id. at 35. Because the majority in Barber v. Turberville decided to vacate the default judgment on other grounds, it was "unnecessary for [the District of Columbia Circuit] to pass upon the point as to whether the plaintiff's demand for trial by jury was properly withdrawn 'without the consent of the parties.'" Id. at 36 (quoting Fed. R. Civ. P. 38(d)). Nevertheless, the District of Columbia Circuit opined that, "in a case such as this, it is the better practice, if not actually compelled, that the issue as to damages be submitted to the jury." Barber v. Turberville, 218 F.2d at 37 (internal citation omitted).

The Honorable E. Barrett Prettyman, United States Circuit Judge for the District of Columbia Circuit, authored a dissenting opinion in Barber v. Turberville. Judge Prettyman disagreed with the majority's conclusion that the underlying default judgment should be vacated and also commented on the plaintiff's withdrawal of her jury demand for the purposes of assessing damages after the default judgment had been entered. Judge Prettyman stated that the plaintiff was entitled to unilaterally withdraw her jury demand because "the right to a jury trial which a defendant would have in a civil action does not survive [the defendant's] failure to appear in any manner in the action." Id. at 38 (Prettyman, J., dissenting). Judge Prettyman noted that, if the word "parties" in the phrase "without the consent of the parties," Fed. R. Civ. P. 38(d), referred to persons who had not appeared, "every case in which a plaintiff follows the customary form and includes in his complaint a demand

for a jury trial would have to take its place on the jury docket and await jury trial," Barber v. Turberville, 218 F.2d at 38 (Prettyman, J., dissenting). In Judge Prettyman's opinion, "defendants ought not to be permitted to delay and confuse proceedings against them by merely ignoring the court's summons." Id. at 39 (Prettyman, J., dissenting). Accordingly, Judge Prettyman concluded that, consistent with rules 5(a) and 55(b)(2), "a named defendant must make an appearance before he has a right to require that the case against him be submitted to a jury." Id. at 38-39 (Prettyman, J., dissenting).

Jurists that have commented on the issue subsequent to the District of Columbia Circuit's decision in Barber v. Turberville have suggested that a defendant does not have a constitutional right to a jury trial on damages after the default. See Weedon v. Gaden, 419 F.2d 303, 304 n.7 (D.C. Cir. 1969)(citing Barber v. Turberville and affirming the district court in a case where district court awarded damages against a defaulted defendant in a damages hearing after the plaintiff withdrew the demand for a jury trial for purposes of the hearing); Hutton v. Fisher, 359 F.2d 913, 919 (3d Cir. 1966)(Freedman, J., concurring in part and dissenting in part)(citing Barber v. Turberville). The Court is not aware, however, of any authority indicating that, once a plaintiff demands a jury trial, the defaulted defendant does not retain his right to a jury trial on damages under the Federal Rules of Civil Procedure.

The Court notes that many cases that have held "that the protection of Rule 38(d) is extended to the defendant after the entry of default, when Rule 55(b)(2) requires a determination of damages," can be distinguished from this case, because they involve defendants who made some appearance in the case and rely on precedent that involved defendants who made some appearance. Kormes v. Weis, Voisin & Co., 61 F.R.D. 608, 610 (E.D. Pa. 1974)(ruling that jury demand associated with

damages hearing could not be unilaterally withdrawn in a case where defendant made an appearance)(citing <u>Bass v. Hoagland</u>, 172 F.2d 205 (5th Cir. 1949); <u>Cinque v. Langton</u>, 8 Fed. R. Serv. (Callaghan) 55 b.224, case 1 (E.D.N.Y. 1944)).  The Court also acknowledges the pragmatic policy arguments underlying Judge Prettyman's dissent in <u>Barber v. Turberville</u>.  Nevertheless, the Court has a difficult time reconciling these persuasive, but not binding, authorities with the plain language of rule 38(d).

The Court must be mindful that the Federal Rules of Civil Procedure are not just a product of judicial committees and the Supreme Court, but also the approval of Congress.  <u>See</u> <u>Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.</u>, 498 U.S. 533,  (1991)("The Federal Rules of Civil Procedure are not enacted by Congress, but Congress participates in the rulemaking process.")(internal quotation omitted).  Under the rules of statutory construction, "[t]he plain language of the Act is controlling unless a different legislative intent is apparent from the purpose and history of the Act." <u>Jefferson County Pharm. Ass'n, Inc. v. Abbott Labs.</u>, 460 U.S. 150, 157 (1983). <u>See</u> <u>Cmty. for Creative Non-Violence v. Reid</u>, 490 U.S. 730, 739 (1989)("The starting point for our interpretation of a statute is always its language.").  The Supreme Court has described reliance on plain language as a "cardinal canon," and explained "time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." <u>Conn. Nat'l Bank v. Germain</u>, 503 U.S. 249, 253-54 (1992).

The Court gave some thought to finding that O'Brien is not a "party" for the purposes of applying rule 38(d), because he did not appear.  O'Brien, however, is plainly a party.  O'Brien must be a party else the Court could not enter a judgment against him.

The Court also considered whether O'Brien could waive any right he has under rule 38(d).

It may be that O'Brien could waive his rights to a jury and other rights by not appearing, but that does not mean the Court is free to ignore the rules. Even if O'Brien is not present to protect his rights, it is not clear to the Court that it should ignore the plain language of the operative rule.

There are also questions about what Mitchell is trying to do. If O'Brien appears, it is unclear whether Mitchell will attempt to withdraw his withdrawal. In addition, the County of Santa Fe is a party, and it is unclear whether Mitchell is attempting to withdraw the jury demand for that party. It is unclear whether he can withdraw a jury demand for one party and not others.

Mitchell has not cited, and the Court has not discovered, any Supreme Court or Tenth Circuit caselaw discussing this issue. In the absence of any affirmative direction from those courts, the Court is hesitant to adopt a rule, however persuasive, pragmatic, efficient, or well-grounded in public policy, that expressly contradicts the text of the rules Congress has approved. In reaching this result, the Court relies on the text of the rule, but also emphasizes that it is Mitchell as plaintiff who is responsible for the jury demand in this case, and controls his destiny. Mitchell exercised his discretion in demanding a jury and added a jury demand to his Complaint. Mitchell could have waited until after O'Brien answered his Complaint. See Fed. R. Civ. P. 38(b)(requiring that a jury demand be made "not later than 10 days after the service of the last pleading directed to such issue"); Kaiser Steel Corp v. Frates (In re Kaiser Steel Corp.), 911 F.2d 380, 388 (10th Cir. 1990)("The 'last pleading directed to such issue' will generally be an answer or a reply, if appropriate, and is determined on a claim by claim basis."). Instead, Mitchell made his decision at the earliest possible time. Mitchell could have avoided this situation by simply delaying his jury demand. Once made, however, Mitchell must bear the consequences of that decision.

The Court re-affirms that it would prefer to proceed in the context of an adversarial setting.

Despite this preference, the Court has already decided that Mitchell is not obligated to serve notice of the damages hearing on O'Brien.  Mitchell may, at his discretion, choose not to notify O'Brien. Irrespective of this choice, however, the plain language of rule 38(d) requires O'Brien's consent before Mitchell may withdraw his jury demand.  Absent binding authority directing it to the contrary, the Court will apply that language.  Mitchell must acquire O'Brien's consent to withdraw  his jury demand or empanel a jury before the Court will enter judgment for damages.

### III.   THE COURT NEED NOT, AT THIS TIME, MAKE FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DAMAGES BASED ON THE EVIDENCE THAT MITCHELL PRESENTED AT THE JUNE 16, 2006 HEARING.

The Court has carefully reviewed the exhibits Mitchell presented to the Court and the testimony that he presented at the hearing on damages in this case.  The Court has done most of the work on its proposed findings of fact.  Because the Court has already decided that Mitchell may not unilaterally withdraw his jury demand for the sole purpose of conducting the hearing to assess damages and Mitchell chose not to empanel a jury at the June 16, 2006 hearing, the Court need not make findings of fact and conclusions of law regarding damages at this time.  The Court will save its work should O'Brien consent to withdrawal of the jury demand.

**IT IS ORDERED** that Mitchell's Request for Hearing in Lieu of Affidavit of Amount Due for Default Judgment is granted in part and denied in part.  The Court held a hearing to assess damages on June 16, 2006.  Because the Court does not believe, however, that Mitchell may unilaterally withdraw his jury demand for the purpose of assessing damages, and because he did not empanel a jury at the June 16, 2006 hearing, the Court will not award damages at this time.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

Dennis W. Montoya
Montoya Law, Inc.

Rio Rancho, New Mexico

    *Attorney for the Plaintiff*