1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF NEW MEXICO

3

4    WALTER MITCHELL,

                    Plaintiff,
5

        vs.                    NO:  CIV-05-1155 JB/LAM
6

7    THE BOARD OF COUNTY COMMISSIONERS
     OF THE COUNTY OF SANTA FE, et al.,

8                  Defendants.

9        Partial Transcript of Trial before The Honorable James O.

10   Browning, United States District Judge, held in Albuquerque,

11   Bernalillo County, New Mexico, commencing on Monday,

12   December 10, 2007, at 8:15 a.m. and concluding at 3:38 p.m.

13   Proceedings recorded by mechanical stenography; transcript

14   produced by computer-aided-transcription.

15   For the Plaintiff:

16       MONTOYA LAW FIRM, INC.
         Post Office Box 15235
17       Rio Rancho, New Mexico 87174-0235
         BY:  MR. DENNIS W. MONTOYA
18
     Also Present:  Mr. Sam Garoffa
19

20

21

22
            Danna Schutte Everett, CRR, RPR, RMR, CCR 139
23             United States Court Reporter
               333 Lomas Boulevard, Northwest
24             Albuquerque, New Mexico  87102
                  Phone:  (505) 348-2283
25                 Fax:  (505) 348-2285

```
1              THE COURT:  A few things.  First of all, the

2    preliminary -- Your statement of the case is fine.  I didn't

3    see any problem with the voir dire, so I will use your

4    statement of the case in introducing the case to the jury.

5              On the preliminary jury instruction, I understood

6    from Ms. Sanchez you had some issue with the --

7              Well -- Okay, let me call the case.

8              Walter Mitchell versus Dennis O'Brien, Civil case

9    number 05-1155 JB/LAM.

10              Counsel will enter their appearances.  There doesn't

11    appear to be anybody from Mr. O'Brien, and the County has not

12    been served.

13              For the plaintiff.

14              MR. MONTOYA:  Dennis Montoya, Your Honor,

15    representing the plaintiff, Walter Mitchell, who is also

16    present.  Also present at counsel table is Mr. Sam Garoffa, my

17    attorney/paralegal for this trial.

18              THE COURT:  Mr. Montoya, good morning to you.

19              Mr. Mitchell, good morning to you.

20              Mr. Garoffa, good morning to you.

21              Mr. Montoya, have you heard from any of the

22    defendants?

23              MR. MONTOYA:  We have not, Your Honor.  All of our

24    filings were duly filed on the Court's CM/ECF system and are

25    public record.
```

1          THE COURT:  All right.  Let's take a look, then -- On

2   the preliminary jury instruction, I know that you indicated to

3   Ms. Sanchez that -- some objection to the preponderance of the

4   evidence portion of it.  I still think the plaintiff is going

5   to have to show the compensatory damages by a preponderance of

6   the evidence.  I don't know of any other standard to use on

7   that.  So I'm inclined to go with the second proposed

8   preliminary instruction that I sent out.

9          Anything else you want to say on that, Mr. Montoya?

10          MR. MONTOYA:  No, Your Honor.  I think it has been

11   covered in our filed objections.

12          THE COURT:  All right.  So I'll give the second

13   proposed preliminary jury instruction.

14          Now let's look at the objections to the final set.  I

15   haven't had a chance to review those.  I just got those this

16   morning.  I know you filed those yesterday, but I just received

17   them this morning.

18          You make an objection to number 3, saying it's

19   based -- objection to this instruction based on it being

20   misleading since there's no second person to the proceeding,

21   instead, only the plaintiff Walter Mitchell is present before

22   the Court.

23          Well, I understand, but they're still a party,

24   they're still a party, we're going to be entering damages

25   against them, so I'm inclined to overrule that objection,

1    because I do think the jury has to be as fair as possible here.

2           But, Mr. Montoya, do you have anything you want to

3    say in support of that objection?

4           MR. MONTOYA:  Only this, Your Honor.  The jury's

5    function at the present time is to determine damages and it is

6    not at this point a proceeding between two individuals.  The

7    jury is asked to function solely in a fact-facing capacity to

8    set a dollar amount for damages, and for that reason we think

9    it's misleading to present this as a contest, because we're in

10   a default posture.  There is, by definition, not -- it's not an

11   adversarial proceeding at this point.

12          THE COURT:  All right.  I'm going to overrule the

13   objection.  I understand it's a little bit different

14   proceeding, but I do think that they're going to have to

15   consider the defendant's conduct and other things.

16          Ms. Sanchez has given you a copy of my second

17   proposed set.  There's a few changes on instruction number 6 --

18   excuse me -- 5, which is on page 6 -- that's just on the

19   margin -- tightening it up.

20          I need to do something on number 11.  I need to get

21   Judge Parker's title for that.  And on number 14, which is page

22   15, I didn't always have Mr. Mitchell and Mr. O'Brien quite in

23   the right place, so I tried to correct that.  Same thing on

24   page 17.  I had plaintiff there, and so I made some changes

25   there.

1              Do you have an objection to 11?

2              MR. MONTOYA:  We withdraw that objection, Your Honor.

3    I've taken a second look at instruction number 11, and I do

4    think it is appropriate.

5              THE COURT:  All right.  So the objection to number 11

6    is withdrawn.

7              I understand what you're saying, and I sort of

8    struggled with that a little bit, too.  But I agree with you, I

9    think it is proper.

10             And you made an objection to number 14 on property

11   damage, and I just couldn't remember -- and I'd be glad to take

12   that portion out.  I think it will actually be on page 8,

13   paragraph 6.  I'll just take out the property portion.

14             With that change on page 18, is the instruction

15   acceptable, Mr. Montoya?

16             MR. MONTOYA:  Yes, Your Honor.

17             THE COURT:  All right.  And then, let's see, on the

18   second set of proposed jury instructions, on the preliminary

19   instruction, we've already discussed burden of proof.  Let me

20   read your instruction to see if there's anything.

21             All right.  All right.  Anything further on the jury

22   instructions?  I do need to make that one change -- or one

23   addition to the mortality table on page 16.  And I'm using the

24   New Mexico mortality table.  It's getting a little old.  There

25   are some newer mortality tables, but I tend to still use that

1    one.

2            Is that acceptable, Mr. Montoya?

3            MR. MONTOYA:  I think that would be fine.  We

4    provided Ms. Sanchez, this morning, with my client's date of

5    birth.

6            THE COURT:  All right.

7            MR. MONTOYA:  I did want to direct the Court's

8    attention to one of the preliminary instructions, and I believe

9    it is in the second set.  It is preliminary jury instruction

10   page 2.  My pages are a bit out of order here, Your Honor, but

11   I believe the transmission was December 4th at 2:25 in the

12   afternoon.  It is the burden-of-proof section of the general

13   preliminary instruction.

14           And the problem that I'm having is with the first

15   full paragraph under burden of proof that begins with "This is

16   a civil case."  It is true that Mr. Mitchell has the burden of

17   proving his case by a preponderance of the evidence.  The

18   difficulty I have is mentioning Mr. O'Brien's evidence in

19   sentence number three --

20           THE COURT:  I think that's fair.

21           MR. MONTOYA:  -- and four because there is no

22   presentation by Mr. O'Brien.

23           THE COURT:  What if I put it this way?  "To put it

24   differently, if you were to put Mr. Mitchell's evidence," and

25   just take out "and Mr. O'Brien's" on -- How about just a scale?

1  Mr. Mitchell would have to make the scales tip somewhat on his

2  side.

3          MR. MONTOYA:  Yes, sir, I think that would be fair.

4          THE COURT:  All right.  Let me go get that changed.

5          Anything else on any of the instructions, either the

6  final set or the proposed -- the preliminary set?

7          MR. MONTOYA:  Nothing further, Your Honor.  Thank you

8  very much.

9          THE COURT:  All right.  Anything else we need to

10  discuss before we bring the jury in?  If not, I'm going to run

11  into my chambers and get these made.

12          MR. MONTOYA:  Nothing further, Your Honor.  Thank

13  you.

14          THE COURT:  All right.

15          All right.  We'll be recess for a few minutes.

16      (Court stood in recess at 8:32 a.m. and resumed at

17      9:06 a.m. as follows:)

18          THE COURT:  Mr. Montoya, anything we need to discuss

19  before the jury comes in?

20          MR. MONTOYA:  No, Your Honor.  I'm ready to go.

21          THE COURT:  Do you still think we can get this done

22  in a day?

23          MR. MONTOYA:  Yes, Your Honor.

24          THE COURT:  Are you ready for the jury panel?

25          MR. MONTOYA:  Yes, sir.

1        THE COURT:  All right, Ms. Sanchez, will you bring

2    them in and seat them.

3        (Prospective jurors in at 9:07 a.m.)

4        THE COURT:  Good morning, everyone.  I want to thank

5    you for what you've already done on sort of a cold, wintry day.

6    I know that, after going through the jury questionnaires, a

7    number of you have come from some great distances here in

8    New Mexico, and so I want to thank you for what you've done.

9        You know, we talk a lot about our democracy and there

10   are -- here we are in sort of a campaign year, where we elect

11   presidents and members of Congress, and that is a very

12   important part of our democracy, but if you think about it,

13   there is nothing more democratic than what is going to take

14   place here today, and that is, after the officials get done

15   passing the laws, signing the laws, we ask the citizens to come

16   in and apply the law to the facts of the case.  And we can

17   watch the evening news every day and see how people resolve

18   disputes around the world, and here we are in a country of 300

19   million people and every day we resolve our disputes in

20   courtrooms throughout the country.  It's a very special thing

21   that takes place.

22        If you did not do what you did today and get up and

23   come and prepare to serve as a juror on this case, then it

24   would be very difficult in our country to have the jury system

25   that we do.  Not many countries have this.  Us and the British

1   and a few other countries trust the citizens enough to just

2   turn it over to the citizens, so this is something that's very

3   special in the world, very unique, and I appreciate you

4   thinking enough about what we do to respond to the summons and

5   do your civic duty and your duty as a citizen to come to court

6   today.

7           We don't get a lot of ways in our society, unless

8   you're in the military, to serve our country, but this is a

9   very important way that we serve our country, so I thank you

10  for what you've already done.

11          I'm Jim Browning.  I'm going to be the judge that's

12  presiding over this matter.

13          Let me introduce you to a few people that are in the

14  courtroom.  Ms. Danna Schutte Everett is my court reporter, and

15  she'll be taking everything down that's said throughout the

16  proceedings.

17          Ms. K'Aun Sanchez is my courtroom deputy.  And for

18  you that are chosen to serve on this jury, you'll get to know

19  her very well.  A lot of the jurors don't say anything about

20  the judge when they leave, but they always give her high marks

21  for taking care of them very well.

22          Ms. Tiffany Roach is my law clerk.  Ms. Roach has

23  just graduated from Baylor Law School, and she grew up here in

24  Albuquerque, went to Albuquerque Academy, and went to

25  Vanderbilt undergraduate, and she's back in town working for me

1   for a year.  She'll work from September to September, and then

2   she goes off and practices herself.  So she'll be in and out.

3          And Nikko Harada is one of my law clerks.  She'll be

4   in less because she's working on other cases.  She's also a

5   young lawyer, member of the New Mexico Bar, went to UNM law

6   school.

7          You may also see my assistant Helen Brow.  She may be

8   coming in and out and bringing us things, but she keeps working

9   on other matters in my chambers during the day.

10          All right.  Now that you're kind of good and

11   comfortable, I'm going to ask you to stand again, and

12   Ms. Sanchez is going to swear you in, and I'm going to tell you

13   what we'll do for the next few minutes.

14      (Prospective jurors sworn.)

15      (Voir dire and jury selection not included in transcript.)

16      (Court stood in recess at 10:03 a.m. and resumed at

17      10:10 a.m. as follows:)

18          THE COURT:  Mr. Montoya, there's one paragraph I

19   didn't get taken out.  I think it relates to the property

20   issues, as well, so I'm just going to take that sentence out,

21   as well, if that's okay with you.  I took out number 6, and

22   those were the additional.  Is that okay with you?

23          MR. MONTOYA:  That's fine, Your Honor.

24          THE COURT:  Have you had a chance to look at the

25   verdict form?  I know it wasn't completely typed this morning,

```
 1    but did that look okay to you?

 2            MR. MONTOYA:  I did have some questions about that.

 3    If I can have a moment?

 4            THE COURT:  All right.  We'll come back to it.

 5            MR. MONTOYA:  Okay.

 6            THE COURT:  Okay.  Are you ready to select the jury,

 7    Mr. Montoya?

 8            MR. MONTOYA:  I think so, Your Honor.

 9        (Jury selection and opening statement not included in

10        transcript.)

11            THE COURT:  Thank you, Mr. Montoya.

12            Mr. Montoya, do you have your first witness or

13    evidence?

14            MR. MONTOYA:  Yes, Your Honor.  We call Walter

15    Mitchell.

16            THE COURT:  Mr. Mitchell, if you'll come up and stand

17    next to the witness box before you're seated, Ms. Sanchez will

18    swear you in.

19        (Witness sworn.)

20            MS. SANCHEZ:  Please be seated.  State your name for

21    the record.

22            THE WITNESS:  My name is Walter Mitchell.

23            THE COURT:  Mr. Mitchell.  Mr. Montoya.

24

25
```

```
 1                       WALTER MITCHELL,

 2          after having been first duly sworn under oath,

 3          was questioned and testified as follows:

 4                      DIRECT EXAMINATION

 5   BY MR. MONTOYA:

 6   Q.    Mr. Mitchell, you currently reside where?

 7   A.    In the university district of Albuquerque.

 8   Q.    Okay.

 9   A.    Nearby.

10   Q.    And before moving to Albuquerque you were a resident of

11   Santa Fe?

12   A.    Yes, that's correct.

13   Q.    What neighborhood?

14   A.    Tierra Rael off Airport Road.

15   Q.    That's kind of the southwest side of Santa Fe?

16   A.    Yes.

17   Q.    How long did you live there?

18   A.    About two years.  A little over two years.

19   Q.    Okay.  And when was the last year that you lived in

20   Santa Fe?

21   A.    The last year I lived in Santa Fe was 2005.

22   Q.    Okay.  I'd like you to tell us a little bit about

23   yourself.  When did you first come to New Mexico?

24   A.    I came to New Mexico in '99 seeking the climate.

25   Q.    You liked the climate here?
```

1  A.    Yes.  I like dry climates.  I had been living in Seattle

2  briefly and was getting a little moldy.

3  Q.    How old are you at the present time, sir?

4  A.    I'm 47.

5  Q.    So in 1999, that would have been about eight years back,

6  you would have been about 39 or so?

7  A.    Yes.

8  Q.    Where did you grow up?

9  A.    Atlanta, Georgia.

10  Q.    And is that where you went to high school and so forth?

11  A.    Yes.

12  Q.    Any military service?

13  A.    Yes.  I was in the U.S. Navy for four years, plus two

14  years of service.

15  Q.    And what was your rank in the U.S. Navy?

16  A.    I was an E5 petty officer second class, aviation

17  structural mechanic.

18  Q.    What year were you discharged?

19  A.    I was discharged in '83.

20  Q.    Okay.  And since 1983 part of the time you lived in

21  Seattle?

22  A.    I returned to Athens, Georgia, near Atlanta and attended

23  college there and received a BA in psych, and after I graduated

24  moved back to California, where I lived for a while when I was

25  in the Navy, and then at the behest of a friend moved up to

1    Seattle and was there for many years.

2    Q.    Okay.  When you say BA in psych, you mean a Bachelor of

3    Arts in psychology?

4    A.    Yes.  That's correct.

5    Q.    Okay.  How have you made your living since leaving the

6    armed services?

7    A.    Well, I have a tendency to be a Jack of all trades, and I

8    have a lot of technical skills, which might be rather odd for

9    someone who has a BA in psychology.  I'm pretty spread over the

10   map that way.  I've worked as a cabinet maker, carpenter,

11   fabricating scientific test gear for the University of

12   Washington.

13   Q.    What kind of scientific testing?

14   A.    This was gear mostly oriented towards measuring metabolic

15   rates in fir trees, actually.  I worked for the forestry

16   department there, so --

17   Q.    All right.  In New Mexico, how have you earned a living?

18   A.    Well, I call myself an inventor, and I'm a gadgeteer,

19   tinkerer, I build things.  I keep my own workshop.  I hesitate

20   to call myself an inventor, because I haven't come up with

21   anything good lately, but I, hopefully, will.

22   Q.    And at your address in Santa Fe up near Airport Road, did

23   you have a workshop at that location?

24   A.    Yes, I did have a rudimentary workshop set up in the

25   carport, which I was attempting to enclose at the time of the

1    shooting.  Never got that job done.

2    Q.   I want to talk about this shooting.  Directing your

3    attention to the time period November 2002.  Do you remember an

4    exact date when this occurred?

5    A.   It was November 4th, 2002.

6    Q.   And would you describe for the jury whether you had reason

7    on that day to come into contact with an officer of the law by

8    the name of Dennis O'Brien.

9    A.   Well, the most brief version of the story possible?

10   Q.   Well, I'd just like you to say whether you did or did not

11   have any contact with him, first of all.

12   A.   Well, I certainly did have contact with him there.

13   Q.   What police agency was he with?

14   A.   Santa Fe Sheriff's Department.

15   Q.   All right, sir.  And because liability in this case has

16   already been established, I don't want to spend a whole lot of

17   time talking about his reason for being there or anything of

18   that nature, but where were you at the time -- Well, first of

19   all, did you sustain any injury as a result of Dennis O'Brien's

20   actions?

21   A.   Yes, indeed.  I suffered three gunshot wounds.  The first

22   was -- went in the palm of my hand and out the top of my wrist;

23   the second went into my forearm, my left forearm and shattered

24   the radius.

25   Q.   Okay.

1   A.    The third went into my left buttock and exited through the

2   groin, and that pretty much blew the top off my femur.

3   Q.    The femur is?

4   A.    The upper long leg bone where it articulates into the

5   pelvis.   There's a ball and socket joint there, and that joint

6   was destroyed.

7           MR. MONTOYA:   Permission to approach the witness?

8           THE COURT:   You may.

9   Q.    (By Mr. Montoya)   Mr. Mitchell, I'm going to show you,

10  before we show these to the jury, some photographs and ask if

11  you're familiar with these photographs.   And I believe there

12  are a total of 12 of them.   Twelve -- Thirteen, if we count

13  this one.

14  A.    Yes, I'm quite familiar with these photographs.

15  Q.    Generally speaking, what are these photographs?

16  A.    They are bullet wounds, entrance and exit wounds.

17  Q.    Okay.  And when were these photos taken?

18  A.    They were taken after I was released from the Santa Fe

19  county jail, where I had been for approximately a month after

20  the shooting.

21          MR. MONTOYA:   Your Honor, we move for the admission

22  of Plaintiff's Exhibit 1, the photographs.

23          THE COURT:   Plaintiff's Exhibit 1 will be admitted

24  into evidence.

25          (Plaintiff's Exhibit 1 admitted into evidence.)

1    Q.   (By Mr. Montoya)  I want to start -- You had described

2    some wounding to your hand.  Where did the bullet enter?

3    A.   It entered in the palm of my hand.  Right there.

4    Q.   Okay.  And let me show you one of the photographs.  What

5    is it that's being depicted in this one?  And we'll call this

6    Plaintiff's Exhibit 1A.

7    A.   That is the partial exit wound of the bullet.  There's a

8    flattened bullet just under the skin there.  That was not

9    removed prior to me being sent to prison.

10   Q.   Is that bullet still with you?

11   A.   No.  I had it removed after I got out of jail.

12   Q.   How long did it remain in your wrist?

13   A.   It was there for -- gosh, it was almost two months.

14   Q.   I'm going to show you what we'll call 1B.  And what is

15   that?

16   A.   That's the entrance wound, which makes a surprisingly

17   small hole, but it does quite a bit of damage.

18   Q.   All right.  And I'm going to show you 1C.  What is being

19   depicted there in 1C?

20   A.   Let's see.  The photographs -- That would be the very tiny

21   entrance wound and a partial exit wound.

22   Q.   I'm going to point to some markings.  Right here, is

23   that --

24   A.   That's an entrance wound, I believe.

25   Q.   And then here?

```
1    A.    That -- Let's see.  That should be in the general area --
2    Have you got a larger view of that one there?
3    Q.    Let's see.  We'll mark this one as 1D.  I think this is --
4    A.    Okay.  That works a little better there.  That would be --
5    In the center of the picture there is the entrance wound.
6    Q.    Right there?
7    A.    Uh-huh.  And that, I believe, is an abrasion from when I
8    fell, fell forward on my driveway and landed on an elbow there.
9    Q.    And what part of your body is there?
10   A.    That's my left forearm.
11   Q.    And can you demonstrate for the jury, holding up your left
12   forearm, where that particular bullet entered?
13   A.    Okay.  That scar there is the surgical resection of
14   reconstruction scar.  The tiny, almost invisible pink spot here
15   is where the bullet entered.  I had my arm at my side at the
16   time.
17   Q.    Okay.
18   A.    And that is where -- Right in the middle of that large
19   scar is where it exited.
20   Q.    Okay.  So the exit wound had been somewhat obscured by the
21   fact that you had to have surgery there?
22   A.    Yes, that's correct.  And that took out about two to four
23   inches of the radius there where it was completely pulverized.
24   Q.    What was the injury to your radius that occurred as a
25   result of that particular bullet?
```

```
 1              Now, that's one bullet?  Yes?
 2   A.    Yes.  The radius was destroyed.  I had to have
 3   reconstructive surgery on it.  This occurred after considerable
 4   delay.  It was two-and-a-half months before I was able to get
 5   it done.
 6   Q.    Now, this photograph is another one of the same series?
 7   A.    That's the exit wound there, yes.
 8   Q.    Okay.  So that's the original exit wound before surgery?
 9   A.    That's correct.
10   Q.    And that would be 1E.
11              And I think this next one, that's just another shot
12   of a different bullet where it entered the palm of your hand?
13   A.    Yes.
14   Q.    And that will be 1F.
15              Now, you talked about the head of your femur being
16   blown off.  How did that occur?  Where did that bullet strike
17   you from?
18   A.    Struck me from behind.  It struck me in the left buttock
19   and exited through the groin, through the inguinal crease.
20   Q.    Can you stand and demonstrate generally where the entrance
21   wound was?
22   A.    The entrance wound's about there.  The exit wound's about
23   there.
24   Q.    Okay.  I will show you a photograph that we will identify
25   as 1G.  And what are we looking at here?
```

1    A.   That is the surgical incision to remove the broken bone

2    and replace it with a prosthetic.   It is extremely inflamed in

3    that photograph, because they don't take staples out at the

4    Santa Fe prison there.   They were supposed to come out a long

5    time before and became infected.

6    Q.   And there's a frontal view.   What is it that's being

7    exhibited here in the inguinal area?

8    A.   That is the exit of most of the bullet.

9    Q.   And when you say "most of the bullet" -- That one will be

10   1G.   You say "most of the bullet."   Where was the rest of it?

11   A.   It's fragmented and still in there.

12   Q.   Is it in there today as you testify?

13   A.   Yes.   Yes.

14   Q.   So you carry bullet fragments with you.   Have you been

15   instructed as to how or when those will be out of your body?

16   A.   They will never be out of my body.   The right wrist in

17   particular is full of many fragments.   Every doctor I've asked

18   about it says it's best just to leave it alone.

19   Q.   I want to go through with you, Mr. Mitchell, step by step,

20   first of all, the experience of actually being shot.   And I

21   know it's not pleasant to recall and, undoubtedly, not pleasant

22   to recount, but I think it's important for an understanding of

23   what you've been through.

24        Do you recall which bullet struck you first?

25   A.   Yes.   The one that struck the palm of my right hand.   I

 1   remember watching in astonishment as my arm sailed up in front

 2   of my face and wondered why it did that.

 3   Q.   So that would be the bullet that made that wound?

 4   A.   Yes.

 5   Q.   What were you doing at that moment?

 6   A.   I was standing, holding the fake sword that I used to

 7   drive off my neighbors Rottweiler, who had attacked me that

 8   morning -- I did not injure the dog, mind you -- and looking

 9   out into the sky, spacing out wondering what the weather was

10   going to be like that day.

11   Q.   Did you see the officer approach you?

12   A.   No, I did not.  His own testimony was that he approached

13   by stealth.

14   Q.   And that is the first bullet wound that you received?

15   A.   Yes, it is.

16   Q.   Which is the next bullet that -- Well, let me ask you.

17   You testified that you were astonished that your hand flew up

18   in front of your face?

19   A.   Yes.

20   Q.   What, if any, sensations and thoughts crossed your mind at

21   that point?

22   A.   Well, I was very startled, and there was a sharp pain, and

23   I --

24   Q.   Did you realize instantly what had happened to you?

25   A.   No.  It was -- The sensation of a bullet wound is not

1   easily distinguished from other trauma there.  It feels kind of

2   like somebody kicked you in the hand or something like that,

3   you know.  So --

4   Q.   What was your initial reaction?

5   A.   Huh?  Well, now, let me back up a moment there.  The first

6   I knew that somebody was standing behind me was when I heard a

7   command to "Put down your weapon," bang, bang, bang.

8   Q.   What was the bang, bang, bang?

9   A.   He began firing before he finished the sentence there.

10  Q.   Was there anyone else near you?

11  A.   Not that I saw.

12  Q.   Were you facing the officer?

13  A.   No.

14  Q.   Now, you had mentioned your neighbor's Rottweiler.  What

15  kind of dogs are these?

16  A.   They're purpose-bred attack dogs, I believe, and good at

17  it, too.

18  Q.   How large a dog -- How large an animal is this?

19  A.   Probably in the vicinity of 110 pounds or so.

20  Q.   Okay.  So, would you give the jury an idea in the order of

21  things.  You testified about seeing your hand rise up in front

22  of your face.  You also testified you heard bang, bang, bang.

23  A.   Right.

24  Q.   In what order did those things occur?

25  A.   Well, it went -- The first bang sent my arm up like that,

1    and then there was a pause of perhaps half a second or

2    second -- time gets distorted in these kinds of things -- and I

3    felt a sensation in my left arm, and it -- it was very much

4    like when you strike your elbow on a sharp, pointed thing.  The

5    funny bone feeling but really intense.  And I still hadn't

6    figured out what was going on at that point.  I watched it sail

7    up in front of my face just like the right hand had done.

8    Q.    Okay.

9    A.    And I was just totally flabbergasted.  I had no idea what

10    was happening there, and wasn't putting it altogether even

11    though I could hear the gunshots.

12    Q.    So that would be this wound?  That was the second wound?

13    A.    Yes.  That's correct.

14    Q.    And you've testified that the gunshots were in very rapid

15    succession.

16    A.    Yes.  They were quite rapid.

17    Q.    How long total for all three shots to be fired?

18    A.    A second and a half, two seconds.

19    Q.    So the third and final wound was to your hip?

20    A.    That's correct.  And that knocked me down on my face.

21    Q.    At what point did you realize that this was gunfire?

22    A.    Well, I hit the ground and was laying there stunned and

23    just trying to damage control, figure out the situation and do

24    something about it.  And then I had the thought, somebody just

25    shot me.  Geez.  And at first I thought it might have been one

1   of my neighbors.  And then someone jumped on my back, pulled my

2   arms behind my back and cuffed me.  And I looked over my

3   shoulder and saw the uniform trouser, and then I passed out.

4   Q.   Now let me ask you, were you in a position to get up after

5   that third gunshot wound?

6   A.   No.  I would have tried, but I would not have been able

7   to, given both arms out of commission and one leg out of

8   commission.

9   Q.   In essence, the top of your hip had been destroyed?  Yes?

10  A.   Yes.  That's correct.

11  Q.   When is the next time after that, that you were able to

12  walk without an assistive device?

13  A.   Well, after I was -- I had been in the hospital about

14  three days and they pretty much made me stand up and stagger

15  around a little bit like that, which was just terribly painful.

16  I thought I was going to faint.

17  Q.   Now, that was after reconstructive surgery?

18  A.   Yes, that's after reconstructive surgery.

19  Q.   What is your understanding -- And I know you're not a

20  physician, but what is your understanding of the reconstructive

21  surgery that was done?

22  A.   It's a hemiarthroplasty, is the technical term.

23  Q.   Hemiarthroplasty?

24  A.   Yes.  Essentially what they did is removed the top part,

25  top quarter or top third of the old femur and drilled down in

1    the middle of it to -- they call it reaming -- to remove the

2    marrow, filled it with epoxy, and stuck the shaft of a

3    prosthetic ball joint into the top of the femur there.  The

4    ball joint replacing the old hip ball, the socket joint there.

5    Q.    And a few days after that they had you doing therapy by

6    getting up?

7    A.    Yes.  Yes.

8    Q.    How did that -- First of all, before we get to how it felt

9    getting up on your feet, I want you to describe the experience

10   from the time you were transported from the scene, in terms of

11   how it felt physically and how it felt emotionally, mentally.

12   A.    Well, I don't remember anything very clearly aside from

13   waking up in the emergency room with a lot of cops standing

14   around laughing at me, and I was angry at that, and I cursed

15   them, and I was sedated.  Some nurse came up and clapped a mask

16   over my face.

17   Q.    At what point did you recognize the officer who had done

18   the shooting?

19   A.    Well, I saw a picture of him in a newspaper clipping that

20   another inmate slipped me.  And I recognized him as a local

21   sheriff's department officer.  He's not a very distinctive

22   looking fellow.

23   Q.    Did you recognize him -- You talked about officers that

24   were standing around laughing at you.  Did you recognize any of

25   them at the time?

1    A.    I think he was one of them, but I was pretty well out of

2    it.  I kept losing consciousness, and I was trying to stay

3    awake and couldn't do it there.  I don't know.  I suppose it

4    was hydrostatic shock or something there.  Or it may have been

5    a fatty embolism already underway.

6    Q.    How long did you remain in that condition at the -- That

7    was the emergency room at St. Vincent's?

8    A.    That's correct.

9    Q.    How long did you remain in that condition?

10   A.    Not long.  I was immediately pretty much whisked into

11   surgery.

12   Q.    And the surgery was performed there at St. Vincent's

13   Hospital?

14   A.    Yes.  That's correct.

15   Q.    What period of time were you in surgery?

16   A.    You mean how long did the surgery take?

17   Q.    Yes.

18   A.    Oh, I'm not really certain.  I think the arthroplasty took

19   a couple of hours, and I remember being billed for two more

20   hours to debride either arm, which I thought was kind of a

21   ripoff, because the bullet was in the right, and I figured for

22   a thousand dollars they should have taken it out.

23   Q.    So minimum of three hours?

24   A.    Four hours or so, yeah.

25   Q.    Four hours?  Now, we've talked about what resulted from

```
 1   this wound here to the arm, and, of course, we've talked about
 2   what resulted from this wound to the hip, but what, if any,
 3   damage resulted from the very first gunshot wound that entered
 4   there through the lower part of the palm of your hand?
 5   A.   Well --
 6   Q.   Was there -- Let me ask it this way.  Was there
 7   reconstructive surgery required as a result of this --
 8   A.   No.
 9   Q.   -- wound here?
10   A.   There was not.  That was utterly miraculous.  The bullet
11   went through the complicated part of the wrist.  It still
12   functions.  The range of movement is limited, like you sprained
13   it really, really badly or something, or dislocated it.  It
14   works.  I'm really happy about that.
15   Q.   You're able to move all of your fingers?
16   A.   Yes.  That's essentially functional except for relatively
17   poor grip strength, and it has a tendency to be sore and
18   painful.
19            MR. MONTOYA:  If I may approach the witness again,
20   Your Honor?
21            THE COURT:  You may.
22   A.   There were several fractures involved in that, by the way.
23   Q.   (By Mr. Montoya)  Mr. Mitchell, I'm going to show you what
24   I think you may recognize, before I show it to the jury.  And
25   page through.
```

1    A.    Okay.  Yeah, I recognize that.

2    Q.    We'll call this Exhibit 2.

3    A.    Okay.

4    Q.    What is it that you had seen as Exhibit 2?

5    A.    That was the reconstruction of the left forearm, which

6    involved a metal strap being bolted to the intact ends of bone

7    and a bone graph taken from my hip, my long-suffering hip,

8    inserted to bridge the large gap where all the shattered bone

9    had to be removed.

10   Q.    And these were radiographic studies?  Yes?

11   A.    Yes.  That's correct.

12   Q.    You've seen these before in the course of your medical

13   treatment?

14   A.    Yes, I've seen them before.

15        MR. MONTOYA:  Move for the admission of Plaintiff's

16   Exhibit 2, Your Honor.

17        THE COURT:  Plaintiff's Exhibit 2 will be admitted

18   into evidence.

19        (Plaintiff's Exhibit 2 admitted into evidence.)

20   Q.    (By Mr. Montoya)  Let me show the first screen of

21   Exhibit 2 and ask that you describe -- You were talking about a

22   metal strap?

23   A.    Uh-huh.

24   Q.    What is that?

25   A.    That is the strap.  You can see the heads of the screws

1    that hold it to the bone there.

2    Q.    Okay.  Now, this is the upper arm?

3    A.    Yes.  That's correct.

4    Q.    So this is the lower arm?

5    A.    That's correct.

6    Q.    And this bone corresponds to the area where the bullet

7    wound was?

8    A.    The intact bone was barely missed by the bullet.

9    Q.    Okay.

10   A.    But the bullet went straight through the center of the

11   radius, the broken bone.

12   Q.    How long did that strap remain in your arm?

13   A.    That's still there.

14   Q.    That is there today?

15   A.    Yes, that is there today.

16   Q.    Okay.  What are we seeing here?

17   A.    That is -- looks to be a somewhat later radiograph of the

18   same injury.  We can see the bone has started to knit together.

19   Q.    So, basically, in order to restore your arm the doctors

20   had to do surgery, install this metal strap, bind it around the

21   bone, and let the bone heal back?

22   A.    Well, they screwed it into the bone.  That's just like

23   wood screws.  Just horribly crude.  In fact, I think a rather

24   poor job was done, because you can see the wrist is dislocated,

25   external fixation should have been applied but was not.  And

1  this -- This arm functions very poorly, indeed.  Things aren't

2  good there.  It really needs surgical revision.

3  Q.   Now, here we're actually seeing three views of the wrists,

4  the distal end of the arm bones.

5  A.   Yes.

6  Q.   I guess here we see some of that metal strap and the

7  screws?

8  A.   Yes.

9  Q.   And then down here at the bottom a little bit of that?

10 A.   Yes.

11 Q.   Is there anything significant about what's being shown

12 here as far as your gunshot injury and recovery from it?

13 A.   Well, yes.  If you look at the wrist joint, you can see

14 that it is clearly dislocated.

15 Q.   Right there?

16 A.   There, yes.

17 Q.   There?

18 A.   Yeah.  And that causes quite -- That's not where it's

19 supposed to be.  That causes a lot of trouble there.

20 Q.   I'd like you to describe for the jury what you go through

21 with that wrist and that arm from that second gunshot wound.

22 A.   Well, as I mentioned before, I build things and am an

23 active person in general, and I've had to learn to cope with a

24 tremendous reduction in the utility of that arm.

25 Q.   Let's go through that in kind of elements of what I think

1    are the utility of an arm.  How about the strength of that arm?

2    A.    Oh, it's pathetic.  I've got a story I could tell you

3    about that.

4    Q.    Is it a story that relates to using the arm?

5    A.    Yes.  This is one of those moments of facing reality.  I

6    try to have a gung-ho attitude about rehab, of, you know,

7    getting over it and getting back together.  I had a friend over

8    helping me cook dinner.  And this is a tiny, little Asian

9    woman, weighs about 80 pounds.  She handed me a jar of spice to

10   open up.  I couldn't get it, er, er, er, like that, so just

11   this kind of thing.  I headed to the workshop to get an

12   enormous pair of pliers to clamp around.  By the time I came

13   back, she became frustrated and had done it herself, damn it,

14   which was humiliating.

15   Q.    This is your right hand and right arm?

16   A.    No.

17   Q.    This is your left?

18   A.    Left.  Well, the left one was the one that was really

19   failing me, but they were both messed up.  Just not really the

20   right thing for opening jars.

21   Q.    I want to establish, are you left or right-handed?

22   A.    I'm right-handed.

23   Q.    So your right hand sustained the very first gunshot wound?

24   A.    Yes.

25   Q.    But it was your left arm that was shattered and had to be

1   repaired with the screws that we've just seen?

2   A.   Yes.   That's correct.

3   Q.   And the metal strap?

4   A.   That's correct.

5         MR. MONTOYA:  May I have permission to approach the

6   witness one more time, Your Honor?

7         THE COURT:  You may.

8   Q.   (By Mr. Montoya)  I'm going to show you a set of four

9   X-rays.  And before I show them to the jury, I want to know if

10  you recognize these and if you're able --

11  A.   Yes.   That is the metal prosthesis stuck into the top of

12  the femur there.

13  Q.   Okay.  And are these true and accurate copies of

14  radiographic studies that you've seen before in the course of

15  your medical treatment?

16  A.   Yes, they certainly are.  I'm quite familiar.

17        MR. MONTOYA:  Move for the admission of four X-rays,

18  Your Honor, as Plaintiff's Exhibit 3.

19        THE COURT:  Plaintiff's Exhibit 3 will be admitted

20  into evidence.

21      (Plaintiff's Exhibit 3 admitted into evidence.)

22  Q.   (By Mr. Montoya)  Let me see how well this projects.  I

23  think it will project okay.

24        What is that luminous object that we see on the

25  screen?

1   A.    That is the artificial ball and socket joint and the spike

2   which goes down into the top of the femur by which it's

3   secured.

4   Q.    Let me see if I've got a little more distant view.

5         What is that?

6   A.    That is the metal shaft which extends down into the femur.

7   Q.    And then this is the top part of the same object?

8   A.    Yes.  That's correct.

9   Q.    And then this is kind of a view as it is situated in your

10  pelvis?

11  A.    Yes.  That's a lateral view.

12  Q.    Now, this is what was inserted in your body to replace the

13  destroyed hip?

14  A.    Yes, indeed.  And my leg is better.

15  Q.    What is this made of?

16  A.    It's made of a Teflon-like plastic and titanium.

17  Q.    How does it feel to function with a -- Now, you are now 49

18  years old?

19  A.    Forty-seven.

20  Q.    Forty-seven.  Sorry.  I didn't mean to make you older.  At

21  47 years of age, how does it feel to function with a completely

22  artificial hip?

23  A.    That is the most disabling of my injuries there.

24  Obviously, you can't feel anything from the metal or anything

25  like that, there's no nerve hookups to that, but there's

1   extensive soft-tissue damage and it's full of bullet fragments.

2   That causes a lot of trouble.

3          The trochanter, the process off to the side of the

4   femur which connects to a muscle group, is no longer there.

5   They just gave up on it, resected it.  So the muscular control

6   over the leg is somewhat inadequate.  And this is mostly

7   manifested when you're doing rotational-type movements.  If

8   you're walking in a swerving path or something like that there.

9   Q.   Now, you've described to me some experiences that you've

10  had while crossing streets or just walking.  Can you describe

11  those briefly for the jury.

12  A.   Well, I really like to walk, and I used to walk and run

13  before the injury was sustained.  I was, and try to be, a

14  fairly athletic fellow.  And it is really annoying.  One of the

15  problems is that the deterioration and function, the onset of

16  pain, that's really too severe just to grit your teeth and

17  pretend like it's not happening, is unpredictable and you can

18  get stuck.  If you go for a long walk, you might not get back.

19  There's been some times I thought I'd have to flag down a cab

20  or something there.  And when it gets to that point, it's

21  usually very sensitive to further injury or inflammation for

22  some time after that, for a few days.

23  Q.   Has the leg ever failed you, given out on you?

24  A.   Not yet.  Oh, well, it -- The nightmare scenario is --

25  When these things need to be replaced, which they do after,

1   perhaps, ten years in a sedentary older person, which they're

2   actually designed for, they let you know they need replacement

3   by popping out of socket.  And I'm not looking forward to that,

4   because I'm sure I'm going to be climbing down a ladder or

5   something when it happens, and that's really not going to be

6   good.

7   Q.   Have you been told what to expect with regards to the

8   lifetime of this artificial hip?  How long do they last?

9   A.   They last between 10 to 12 years on the average, is the

10  figure that I've read, and that is in a sedentary individual.

11  Q.   And you're a fairly active individual?

12  A.   Try to be.

13  Q.   And you've already had this one for five years?

14  A.   Yes.  So it's kind of scary to think about that there.

15  Q.   What is the cost of replacing an artificial hip, as you

16  understand it?

17  A.   Well, the first one cost about $20,000, more or less, to

18  replace.  That was the original surgery.  The second -- The

19  revision, replacing one that's already installed is pretty

20  scary, because you can't just unplug the old one and pop a new

21  one in.  You've got to do the large incision all over -- an

22  even larger incision, because the femur -- the top half of the

23  femur where the -- you saw the shaft was inserted -- has to be

24  split to get out that shaft that's inserted in there.

25  Q.   So --

1    A.    So it becomes a rather complex surgery and has potential

2    to be very expensive, indeed.

3    Q.    Going back to one of the X-rays here, which I believe are

4    Exhibit 3, that shaft goes down inside the existing bone?

5    A.    That's correct.

6    Q.    And what you're saying is that the replacement procedure

7    for this unit is to break open that bone to pull this out?

8    A.    Yes.  You have to split the bone longitudinally, because

9    it's epoxied in there.

10             MR. MONTOYA:  Permission to approach the witness

11   again?

12             THE COURT:  You may.

13   Q.    (By Mr. Montoya)  I'm going to show you a whole stack of

14   documents, Mr. Mitchell.  I'd like you to take a moment and see

15   if you recognize what those are.

16   A.    These are medical bills, basically, for -- related to the

17   injuries I sustained.

18   Q.    And you've had the opportunity to review those before?

19   A.    I have not seen them in this format.

20   Q.    Okay.  But you provided those to my office, and a release

21   to obtain them?

22   A.    Yes.

23             You have to forgive me.  I'm not the best person with

24   numbers, and I try not to think about this stuff.

25   Q.    Sure.

1    A.    I've got kind of a shock syndrome going.  But these appear
2    to be correct.
3    Q.    Okay.  And those appear to be copies of your actual
4    medical bills?
5    A.    Yes.  That's correct.
6              MR. MONTOYA:  Move for the admission of Exhibit 4,
7    Your Honor, as the medical expense billings for Mr. Mitchell.
8              THE COURT:  Plaintiff's Exhibit 4 will be admitted
9    into evidence.
10        (Plaintiff's Exhibit 4 admitted into evidence.)
11   Q.    (By Mr. Montoya)  Now, this is not a bill, but a summary.
12   And the first item on there is St. Vincent Hospital.
13   A.    Yes.
14   Q.    Now, that amount is for four days in the hospital at
15   St. Vincent's?
16   A.    Yes.  That's correct.
17   Q.    Is that charge accurate, $25,689.25?
18   A.    I seem to recall the hip itself being a little more than
19   $20,000.  The other charges would be for wound debridement,
20   hospital stay, radiographs, what have you.
21   Q.    All those little extras that go into a hospital stay?
22   A.    Yes.
23   Q.    Now, the Santa Fe Orthopedic Clinic is Dr. Louis Edward
24   Seade -- Is that --
25   A.    Yes.  That's correct.

1   Q.   That is a charge of $5,042, and then another $213.   What

2   is that?

3   A.   Those are charges that I would have to see in an itemized

4   form.

5   Q.   What did Dr. Seade do with regard to your surgery and

6   injury?

7   A.   He removed the -- He made an incision, debrided the wound

8   to the best of his ability, removed the top of the femur and

9   replaced it with an artificial replacement.

10  Q.   Then item number 3 are the numerous consultations with

11  Dr. -- Is it Elliot Rappaport in Santa Fe?

12  A.   Yes.   That's correct.

13  Q.   Various charges.   Why were you going to see Dr. Rappaport?

14  A.   My lawyers that I had at the time, who I'm very

15  dissatisfied with, conceived the idea because the police had

16  told them that I was a madman, that I might well be, and so

17  they wanted me to consult with a psychologist at regular

18  intervals, which really wasn't that bad a deal, because it was

19  somebody intelligent to talk to, at least, and he was a decent,

20  sympathetic fellow.

21  Q.   Was this in any way related to your gunshot injury?

22  A.   Well, yes.

23  Q.   Did this assist -- What is it that Dr. Rappaport treated

24  you for?

25  A.   Well, it was not so much treatment as evaluation and

1  consultation.  He did a Minnesota Multiphasic Inventory on me

2  to evaluate neurological functions and basic psychological

3  integrity.

4  Q.   What, if any, psychological impact has the shooting had on

5  you?

6  A.   These days I'm on antidepressants.

7  Q.   How long have you been on antidepressants?

8  A.   On and off over the time since the shooting there.  I

9  really don't like to take them.  I'm afraid they interfere with

10  your judgment in some ways, but I've got to keep it together

11  some way or another in there, so --

12  Q.   I'd like you to give the jury an idea of what happens

13  without the antidepressants.

14  A.   I get depressed and I find that when I'm able to, more or

15  less, objectively evaluate my own behaviors recently, and all

16  that, I'm becoming very withdrawn and desocialized, morbid.

17  Q.   How is that different from before the shooting, if it is

18  different?

19  A.   Well, one of the things that was always very important to

20  me to maintain psychological well-being -- and the literature

21  supports this as being a very common phenomenon -- is to get a

22  lot of exercise, and so I was unable to do that anymore.  That

23  was one of my linchpins taken out from under me, as it were.

24          There's been a damage to self-esteem that way.  I'm a

25  vain person.  The feeling of weakness and vulnerability is very

1    disturbing.  And it's just really annoying when I'm trying to

2    work in the workshop, or something, and the left hand won't

3    work.  The thumb is nerve-damaged and functions unreliably.

4    Q.   With what frequency, Mr. Mitchell, do you have those kinds

5    of feelings?

6    A.   Anytime I try to do anything.  It's like -- You get used

7    to anything, and some of the times I'm just, Yep, this is the

8    usual.  But then every once in a while I just get this surge of

9    outrage and disbelief that what had been perfectly good limbs

10   before are now so faulty.  And I realize, on the human scale of

11   trauma, that it's not really that much, but when it's your

12   body, the only one you've got, it's not going to --

13   Q.   Who prescribes the antidepressants that you are taking at

14   the present time?

15   A.   I utilize an urgent care medical service.  I don't have a

16   regular doctor.

17   Q.   What would be your best description of what it is for

18   Walter Mitchell to be depressed, since many different people

19   experience that differently?

20   A.   Well, I've always prided myself on being a very

21   industrious person, and when I see myself slipping off the

22   curve of industry, like I mentioned before, not having come up

23   with any decent inventions lately, it bums me out, and it just

24   ranges for me sort of a numb apathy or a tendency to retreat

25   into my computer, to, frankly, an objective contemplation of

1  when is it going to be time to commit suicide there.

2  Q.   Mr. Mitchell, when did these feelings start?

3  A.   Well, being a normal human being, I'd had episodes of

4  depression before -- after my marriage ended it was a pretty

5  bad time -- but I'd say it almost seems delusional in

6  retrospect, but somehow I figured that justice was going to

7  prevail and I was going to be okay, up until the time when they

8  kind of slapped me back together and sent me back to the jail.

9  And when they didn't book me or anything, I started getting

10 scared, figured I was going to get disappeared or something.

11 Q.   And at that point you experienced what you would call the

12 first depression after the shooting?

13 A.   Yeah.   Things just came crashing in, the reality of the

14 situation there.   And from that point on it became something of

15 a struggle to maintain a good attitude, let's say.

16 Q.   Now, there are a series of charges here from the

17 University of New Mexico Hospital.

18 A.   Uh-huh.

19 Q.   All of them in calendar year 2003.   In what way are these

20 related to your shooting injury?

21 A.   Those are for the removal of the flat bullet from the

22 right wrist and the reconstructive surgery that was done on the

23 left forearm.

24 Q.   Okay.   So these are related to the X-rays that we saw --

25 A.   Yes.

1   Q.    -- with the insertion of the strap and the screws into the

2   left forearm?

3   A.    That's correct.

4   Q.    All right.  A few charges from Santa Fe Imaging/Santa Fe

5   Radiology.

6   A.    Uh-huh.

7   Q.    These are in 2002, 2003, 2004.

8   A.    Yes.

9   Q.    Let's start with this $159 charge in 2002.  What was

10  that --

11  A.    That probably --

12  Q.    -- to the best of your recollection?

13  A.    That was probably the initial radiograph done to assess

14  the damage to the hip.

15  Q.    Okay.  And then in 2003 there was $95.40?

16  A.    Yeah.  That would -- That would have been another hip

17  X-ray, I think.

18  Q.    And then yet again in 2004?

19  A.    Probably another hip X-ray.  I was complaining of pain and

20  whatnot, and they had to look and verify the obvious there.

21  Q.    And in our last medical expenses category we have

22  University Physicians Associates on numerous dates in 2002 and

23  2003.

24  A.    Yes.  Those would have been consultations and

25  miscellaneous physicians' fees and -- Let's see.  I had some

1   insurance at the time, that was actually paying off, and it

2   looks like it's only my co-pay that is showing up on some of

3   these.

4   Q.   Okay.  And these are related to which injuries?

5   A.   Those were primarily related to the left forearm

6   reconstruction.

7   Q.   Okay.  This figure of $50,502.16 is supposed to be the sum

8   total of everything that we've reviewed.  Do you agree or

9   disagree with that total?

10  A.   I guess that must be correct.  And -- Yes, that would be

11  correct.

12  Q.   In what way, if any, Mr. Mitchell, has this set of

13  injuries impacted on your ability to earn a living, to make

14  money for yourself?

15  A.   Well, for instance, any job that requires moving around,

16  which is the kind of job I like, my abilities are extremely

17  limited.  When I work in my shop, light woodwork in the shop,

18  I'm usually pretty lucky to get in a five-hour day before the

19  hip starts getting too painful and I have to retreat to the

20  computer.  I've got a special computer work station that I

21  built which allows me to lay flat on my back and operate the

22  computer and do computer-aided design work and stuff,

23  because --

24  Q.   Why is that necessary?

25  A.   That's about all you can really do when it's really

1   hurting there.  Sitting becomes uncomfortable at some point.  I

2   wouldn't want to have a desk job in this situation, because,

3   for reasons I do not completely understand, the hip becomes

4   quite painful and stiff when you sit for a prolonged period of

5   time.  So that's probably my last good invention, was the

6   computer work station where you recline there.  So -- It's very

7   useful.

8   Q.   Mr. Mitchell, with what frequency do you experience

9   physical pain these days?

10  A.   Oh, every day for sure.  The first thing I say in the

11  morning is usually, "Ouch," a few curse words.

12          There is no activity that is not impacted except any

13  hypothetical activity that you do only with your right leg.

14  And it's highly dependent on the weather and very variable, I

15  guess, very unpredictable, which is one of the very annoying

16  things about it, because it makes it hard to plan.

17  Q.   You have calculated at least some of your damages; is that

18  correct?

19  A.   Yes.  I've made a very unprofessional attempt to calculate

20  damages there to the best of my understanding.

21  Q.   What are the categories in which you have attempted to

22  calculate your damages?

23  A.   Okay.  Pain, wounds, surgeries to date, orthopedic to

24  date, future orthopedic, future surgeries, impaired ability to

25  exercise and maintain fitness, cardiovascular deterioration due

1    to lack of fitness, musculoskeletal deterioration due to the

2    lack of fitness.  I can't lift weights anymore.  Aggravation of

3    the above due to poor medical care and delay of care, which I

4    just recounted some of; potential of future complications,

5    which I find quite terrifying, because things don't always go

6    too routine in the hospital.  There are severe hazards

7    associated with femur reconstructions in particular there.  You

8    can get a thing called a fatty embolism.  And I appear to have

9    one lodged in my left vertebral artery, and I have angiograms

10   and CAT -- MRI's to support that contention there.

11   Q.   Mr. Mitchell, let's go through these categories one at a

12   time.  What is the first one you calculated?

13   A.   Now, wait a minute.  Let me backtrack just a little bit

14   here.

15   Q.   Sure.

16   A.   Related to the above, emotional distress, frustration,

17   depression, apathy, damage to self-image, impaired social

18   interactions, dissociative syndrome, memory impairment,

19   increased anxiety over health issues.

20          Now, I calculated damages relevant to those on the --

21   after extensive discussions with yourself on the basis of --

22   and readings that you have given me.  I came up with a

23   hypothetical blackmail scenario, wherein, what would you pay to

24   keep this from happening to you?  You'd pay everything you had,

25   basically, to keep from being severely injured and permanently

1   crippled.  And so I applied a rate of $300 a day times 42 more

2   years of expected lifetime on that, which could be debated, but

3   that's what I arrived at.

4   Q.   Now, 42 more years would put you at about age 90?

5   A.   Eighty-five, I would think.

6   Q.   If you're 47 now and another 42?

7   A.   I was going from 43.

8   Q.   From when it happened?

9   A.   From when the incident occurred.

10  Q.   Fair enough.  Why do you give yourself a life expectancy

11  of 85?

12  A.   Well, my father's 84 right now, and he takes really poor

13  care of himself and is still hanging in there.  Many of my

14  relatives further back have exceeded 100.  We seem to be a

15  long-lived line there.  As you can see, I look fairly decent

16  for a 47-year-old with my particular history there.  And I

17  think there's every reason to expect that I'll be a --

18  potentially long lived there.

19  Q.   Okay.  Have you calculated a total for all of the

20  categories of damages that you have worked up?

21  A.   Okay.  We may have to backtrack again here.  We've got

22  some overlapping things.

23          All right.  I have also calculated projected medical

24  expenses and medical expenses thus far.  And I can read that

25  off to you if you want there.  But the anticipated

1    antidepressant medication, Lexapro, 20 milligrams, $220 a

2    month.

3    Q.    Is that what you're paying now?

4    A.    Yes.  That is not accounting for future inflation and just

5    doing the best I can here.  It's kind of hard to come up with a

6    firm figure.  Anyway, 220 times 42 years times 12 months is

7    $110,880.

8    Q.    Now, that figure's just for the Lexapro?

9    A.    Yeah.  Yeah.  I have been getting acupuncture treatments

10   and taking Chinese herbs.  I studied Chinese medicine myself,

11   so this is an avenue that I'm interested in, is somewhat

12   effective in maintaining my functions without drugging myself

13   or anything.  Limiting the pain to that experience and

14   improving my flexibility and mobility and emotional well-being,

15   as well.

16            That works best if you visit about every week.  I

17   didn't start that until awhile after the shooting, so I'm going

18   to say -- and that costs about $75 a visit.  So $75 times four

19   times 12 times 39 years, if we assume we're going to keep doing

20   that for 39 more years, that's $140,400.

21            An artificial hip lasts 10 to 12 years.  I was being

22   optimistic here.  I said 12 years, because I'm running down the

23   line and I just can't face it.  Therefore, approximately three

24   revisions in the rest of my life will be necessary.  It may

25   easily be argued that the cost of these will double at these

1    intervals based on historical ballooning of medical expenses.

2             Additionally, each surgery will be more complex than

3    the previous, since the femur must be split to remove the

4    porosities.  The first surgery cost approximately $20,000.  The

5    following estimates are, therefore, reasonable.  First revision

6    $60,000, second revision $120,000, third revision $240,000.

7    Q.   What is the grand total of all of the expected hip

8    replacements for your lifetime?

9    A.   Well, we've got another one to put into here.  I put all

10   the ortho in the same category when I add it up here.  We also

11   need, if I can face it, a revision of the left arm to restore

12   it to somewhat -- at least to make it the right shape.

13   Q.   And you're talking about the distortion resulting from

14   the --

15   A.   Yes.

16   Q.   -- permanent sprain in the wrist?

17   A.   Yes.  And the bow that's in the bone where the strap is.

18   You can see it's a little withered and not quite shaped right

19   there.  And that causes functional problems there.  It doesn't

20   like side loads and stuff.

21             So, I'm saying that could cost easily $50,000 to

22   revise there.  The thing is that will be rather a complex

23   surgery, involving external fixation for a long period of time.

24   It's just not going to be much fun.  I'm really going to have

25   to bite the bullet on that one, too.

1           The sum of these medical expenses is $739,280.

2           So, added to the $4,599,000 that is the $300-a-day

3    rate for a version of emotional distress by the hypothetical

4    model that I gave you, that comes to $5,338,288.

5    Q.   That is what you experience and what you expect to

6    experience for the remainder of your days on earth?

7    A.   Yes.  That is correct.

8    Q.   Based on your personal observations at the scene, your

9    experience with the officer, Dennis O'Brien, was there anything

10   that you saw and experienced that would suggest that the

11   officer acted either maliciously or with reckless disregard for

12   your safety?

13   A.   Well, he shot me without giving me proper warning, shot me

14   in the back, which is generally considered dirty pool, shot me

15   when I was not a threat to anyone else, altered evidence and

16   concocted an absurd story afterwards to posit the scenario that

17   I had attacked him.

18   Q.   Let me ask you, do you have a recollection of being moved

19   at all during the period of time that you were at the scene,

20   other than by the emergency medical?

21   A.   Yes.  Well, I lost consciousness facedown in the weeds in

22   my side yard -- or in my front yard, more properly, to the --

23   right beside my car, and then the next time I had a brief

24   interval of consciousness I was naked in the middle of the

25   street lying on my back.  The handcuffs had been removed at

1    that time, my clothing had been cut off.

2    Q.   Do you have a recollection of who was present at that

3    point?

4    A.   I remember two cops, one of which I suppose was Dennis

5    O'Brien, asking me questions and wasn't really able to

6    coherently reply, and I decided I better just keep shut up, and

7    then I passed out again.  And had brief flashes of

8    consciousness, being loaded into the ambulance and in the

9    emergency room and stuff like that.

10   Q.   Is there anything else that you recall that would suggest

11   to you that Officer O'Brien acted maliciously or with reckless

12   disregard for your well-being?  You talked about the fact he

13   shot you without warning, he shot you from behind, he shot you

14   when you were not posing a threat.

15   A.   And he promulgated an account of events that, it would be

16   fair, would ruin my life, which is --

17   Q.   Okay.

18   A.   -- not good.

19   Q.   Is there anything, Mr. Mitchell, that we have not touched

20   on that is significant to the events -- we've touched on quite

21   a bit -- or your damages more to the point of this hearing?

22   A.   Well, I think we've hit the major topics.  All these

23   things make the future very uncertain.  I did the best job I

24   could of trying to estimate fair recompense.

25   Q.   I want to ask you one closing question.  It may be

1    difficult to answer, but perhaps you have an idea.

2            In terms of change to your life, with 100 percent

3    representing a total and complete change and zero percent

4    representing relatively no impact, can you assign a percentage

5    of change that being shot by Dennis O'Brien has brought to your

6    life?

7    A.   Gosh.  At least 85 or 90 percent.  I mean, like I said,

8    there is nothing in my life that is unaffected by it.  The

9    comfort is that I still do remain some capability, that I'm not

10   in a wheelchair or that I still actually do have two hands

11   attached to the ends of my arms and stuff like that.  But

12   everything's changed.  True.

13   Q.   Thank you, Mr. Mitchell.

14           MR. MONTOYA:  No further questions.

15           THE COURT:  Thank you, Mr. Mitchell.  You may step

16   down.  Thank you for your testimony.

17           Mr. Montoya, does the plaintiff have further evidence

18   or witnesses you wish to present?

19           MR. MONTOYA:  We do, Your Honor.  We call William

20   Patterson.

21           THE COURT:  Mr. Patterson, if you'll come up and

22   stand next to the witness box before you're seated, Ms. Sanchez

23   will swear you in.

24       (Witness sworn.)

25           MS. SANCHEZ:  Please be seated.  State your name for

```
 1    the record.
 2              THE WITNESS:  I'm William Patterson.
 3              THE COURT:  Mr. Patterson.  Mr. Montoya.
 4                       WILLIAM PATTERSON,
 5         after having been first duly sworn under oath,
 6         was questioned and testified as follows:
 7                      DIRECT EXAMINATION
 8    BY MR. MONTOYA:
 9    Q.   Good morning, sir.
10    A.   Good morning.
11    Q.   Mr. Patterson, how are you employed?
12    A.   I'm self-employed.  I call my company Legal Economics.
13    It's a business started by my mother back in the 1960's, and
14    I've been sole proprietor to that since about 2000.
15    Q.   Your mother would be Melissa Patterson?
16    A.   Yes, sir.
17    Q.   And she is also an economist?
18    A.   Yes.
19    Q.   Mr. Patterson, have you ever testified in court on the
20    subject matter of economics?
21    A.   Yes, I have.
22    Q.   And have you been accepted as an expert in that field of
23    expertise?
24    A.   Yes, I have.
25    Q.   On approximately how many occasions?
```

1   A.   I have, over the years, lost track of that.  I first

2   started working in this business in February of '86, so it's

3   been 20 years now.

4   Q.   So quite a few times, fair to say?

5   A.   A great number of times, yes.

6   Q.   Have you testified before this court, the U.S. District

7   Court for the District of New Mexico?

8   A.   Yes, I have.

9   Q.   And would you describe very briefly your training that

10  qualifies you to testify in the subject area of economics?

11  A.   Certainly.  In terms of education, I have a bachelor's

12  degree in economics from Carleton College back in 1979, and

13  then extensive on-the-job training.  When I went to work at

14  Legal Economics, for about the first couple of years, my mother

15  showed me what we do, how we do it, the rules of the court,

16  measures of damages, and so forth.

17  Q.   Now, Mr. Patterson, you were contacted by my office and

18  asked to do a study of Mr. Walter Mitchell's situation; is that

19  correct?

20  A.   Yes, sir.

21  Q.   And do you recall about when that was?

22  A.   It was back in the spring or the summer of 2006.

23  Q.   Okay.  Could you describe for the Court what materials, if

24  any, you undertook to study in connection with that assignment?

25  A.   Well, in connection with that, I was furnished by your

1    office a number of medical bills, medical chart from

2    St. Vincent's, a copy of the Complaint in this matter, a couple

3    of letters, like reference letters from people who knew

4    Mr. Mitchell before his injury, and a number of items just kind

5    of like that.  Particularly, the medical records were of

6    import.  And then I spoke with Mr. Mitchell at one point and

7    discussed his situation with him and got some information from

8    him concerning --

9    Q.   Now, is the information that you have studied, including

10   the interview with Mr. Mitchell, information of a kind and type

11   that is normally relied upon by experts in your field?

12   A.   Yes, it is.

13   Q.   And are you able to render an opinion with respect to

14   Mr. Mitchell's damages in this case?

15   A.   Yes, sir.

16           MR. MONTOYA:  Your Honor, we would proffer

17   Mr. Patterson as an expert in the field of economics.

18           THE COURT:  Mr. Patterson will be permitted to offer

19   opinion testimony in the field of economics.

20   Q.   (By Mr. Montoya)  Now, I wonder if you could describe the

21   two basic types of data that you need to undertake a study such

22   as the one in this case.

23   A.   Well, yes.  There are two basic types of data.  First of

24   all, I need sociologic data, things like the gender of the

25   individual, either a man or a woman, their date of birth and

 1  the date of their injury.  Those help me determine how far out

 2  into the future I should be looking on the basis of life

 3  expectancy.

 4          Then the second bunch of data is basically economic

 5  information.  What does Mr. Mitchell do for a living?  What

 6  kind of earning does he have?  What kind of education does he

 7  have?  What would be his capacity to earn money if he were to

 8  go out into the market and market himself a job.

 9          Those are the two basic data.

10  Q.   What did you find with respect to Mr. Mitchell in terms of

11  his employment qualifications?

12  A.   Mr. Mitchell's been employed in a number of different

13  things.  Like he testified today, cabinet making, working,

14  making scientific things.  He calls himself an inventor.  He is

15  an inventor.

16  Q.   With respect to his educational background, sir, what did

17  you find in your study?

18  A.   I asked him about that, and he said a bachelor's degree --

19  he had a bachelor's degree in education.

20  Q.   Okay.  And what statistical database, if any, did you look

21  at in making calculations about average earnings?

22  A.   I looked at the average earnings of male college

23  graduates, which is developed by the Bureau of Labor Statistics

24  and the Census Bureau jointly, and it's published annually in

25  various places, and it's the way that we economists keep track

1    of average earnings by education and sex.

2    Q.    Okay.   Now, in addition to that kind of economic

3    information, is there other information that you need to look

4    at?

5    A.    Well, yes.   In particular, I want to know a person's life

6    expectancy, how long can I reasonably expect a person to live.

7    And for that I use the National Institute of Health Statistics

8    median life expectancy, which is published on an annual basis.

9    Or -- you'll read from time to time that our life expectancy

10   has gone up by a half a year or year, or whatever it may be,

11   and that's the study to which I'm referring.

12           And, basically, it's a question of taking the census,

13   and then they subtract from that census everyone's death

14   certificate for anyone that has died and add to that census the

15   birth certificates of everyone who has been born, and by

16   looking at that set and using actuarial data the government can

17   tell us what the median life expectancy of a person is.

18           Now, at the time Mr. Mitchell was injured, he was 43

19   years of age, so I looked at the median life expectancy of

20   43-year-old men and I found that to be an additional 34.3

21   years.   What we mean by that is, of all the men age 43, when

22   they reach about age 77, I would expect half of those men to

23   still be alive and the other half to have died.   So it's kind

24   of a 50/50 point there.

25   Q.    You heard Mr. Mitchell testify that his father is now 84

1    and he expects to have a relatively long life.  How does

2    individualized information like that relate into your study?

3    A.    You know, I can't tell you just by looking at Mr. Mitchell

4    or any one of us how long exactly we will live.  It's not

5    possible, because my crystal ball is just as cloudy as anyone

6    else's.  After all, we may step off the curb and get hit by a

7    bus, those kind of things that you hear about.  But what this

8    is about, what this study is, that I use, is out of all of us,

9    those of us who are very healthy as well as those of us who are

10   literally at death's door, everyone in the census, if you look

11   at that, then what I can tell you about Mr. Mitchell is that

12   when all the men his age reach the age 77, half of them will

13   have died, half will still be alive, but I don't know which

14   half Mr. Mitchell is likely to fall into.

15   Q.    So then it would be fair to say that your science, the

16   science of economics, looks at very global, large pictures and

17   actuarial data that involves millions of individuals and that

18   is why your estimates are conservatively based on an entire

19   population?

20   A.    Well, right.  There are particular things about

21   Mr. Mitchell, but in general here I'm speaking about all the

22   men age 43, all the men that have bachelor's degrees who are

23   about in their forties and fifties, things like that.  So the

24   type of data that I try to use is the best available

25   information that we have about our US economy.  And, in my

1  opinion, the National Institute of Health Statistics Bureau,

2  the census, Commerce Department, Labor Department, they have

3  the best information about these matters.

4  Q.   Now, you were also asked to look at Mr. Mitchell's medical

5  expenses?

6  A.   Yes.

7  Q.   I'm going to show you a sheet that's been previously

8  admitted as Exhibit 4 and ask if these numbers are consistent

9  with the numbers that you studied, particularly this total

10  charge here at the bottom of $50,002.16.

11  A.   Yes, that's -- that's what I've found in records.

12  Q.   Have you reached any expert opinion with respect to future

13  medical expenses likely to occur?

14  A.   Yes, I did look at future medical expenses.  I looked at

15  about four different years here.  I did do that.  I looked at a

16  generic value, each thousand dollars per year as like a

17  benchmark which will allow us to determine the present value of

18  any amount of future annual expense, and I also made a schedule

19  about hip replacements as a second thing.

20  Q.   What did you determine with respect to the first

21  calculation?

22  A.   Well, in terms of the present value of each $1,000 per

23  year future medical expense, what I did was I did -- You know,

24  he was 47 years of age in 2006 when I did this, and I expect

25  him to live about another 30 years, so the present value of

1   each thousand dollars per year.

2          What I'm solving for here is how much money would we

3   have to place at interest today in a safe and secure account,

4   tax free so we can withdraw $1,000 worth of medical expense

5   each and every year for 30 years.  And at the end of the

6   30-year period, all the money, the principal, would be placed

7   in the account, as well, and the interest that it had earned

8   would be consumed.  That's what I mean by present value, how

9   much we put in the bank today so we can make a withdrawal each

10  and every year into the future and at some point consume that

11  fund.

12         The present value of each $1,000 per year is $36,133.

13  That takes into account medical inflation, which we know

14  outstrips regular inflation and is based on the discount rate

15  of safe and secure, tax-free municipal kinds of bonds which you

16  can purchase.

17  Q.   And that figure again?

18  A.   $36,133.

19  Q.   And what does that represent?

20  A.   If we were to place at interest $36,133, we could withdraw

21  each and every year across Mr. Mitchell's life expectancy

22  $1,000 worth of medical expense.  At end of that 30th year, we

23  would have withdrawn all $36,000 as well as the interest.

24         This is a figure I utilize in this way.  Since it's a

25  benchmark -- If we believe, for instance, that the expense

1  would be $10,000 per year, then the present value would be

2  $361,330.  If we believe that the expense is going to be $500

3  per year, then we take half of that $36,000, or about $18,000,

4  to get present value.

5          So it's useful for -- There's a facility there

6  because the decibel system let's us utilize any amount that you

7  may find he needs on an annual basis.

8  Q.   Put into language that I understand, what you're saying is

9  that for each thousand dollars that Mr. Mitchell will have to

10 spend over his future years he'd have to have $36,133 --

11 A.   That's right.

12 Q.   -- in the present day?

13 A.   Each thousand per year on an annual basis.

14 Q.   Did you reach a determination as to what his average

15 per-year medical expense will be over his lifetime?

16 A.   That, I don't know.  That is really a medical issue.  It's

17 outside my area of expertise to tell you that this exact

18 individual will need the following basic things.  We do know

19 that the cost of these hip replacements, like he testified to,

20 rise with each -- each time you have to do it because it's a

21 more complicated operation, and the ten-year life expectancy is

22 standard for those kinds of orthopedic devices in all the cases

23 I've worked on.

24 Q.   So you have worked on similar cases?

25 A.   I have.  I've worked on a number of cases about hip

1   replacements.

2   Q.   And you've testified about hip replacements?

3   A.   Oh, yes.

4   Q.   And the need periodically to basically redo the surgery?

5   A.   Right.  Those hip replacements and any kind of joint

6   replacement has a life expectancy based on the severity of the

7   operation and the type of operation you have.  But for knees

8   and hips and normal people and middle age, it's about ten

9   years.

10  Q.   What else did you look at in reaching determinations with

11  respect to Mr. Mitchell?

12  A.   I looked at Mr. Mitchell's earning capacity on the basis

13  of the average earnings of males with bachelor's degrees, I

14  looked at the value of each hour per day of household service,

15  and I also looked at the present value of each $10,000 per year

16  lost value of the pleasure of life.

17  Q.   Okay.

18          THE COURT:  Mr. Montoya, would this be a good place

19  for us to take our lunch break?

20          MR. MONTOYA:  Certainly, Your Honor.

21          THE COURT:  All right.  Ladies and gentlemen, I think

22  this is where we'll take our lunch break.  I'm going to ask you

23  to come back at -- be here about 1:15 so we can get ready to

24  go.

25          Let me remind you of a few things that are especially

 1   important.

 2          Until the trial is completed, you're not to discuss

 3   this case with anyone, whether it's members of your family,

 4   people involved in the trial, or anyone else, and that includes

 5   your fellow jurors.  So if anyone approaches you and tries to

 6   discuss the trial with you, please let me know about it

 7   immediately.

 8          Also, you must not read or listen to any news reports

 9   of the trial.  Again, stay off the internet and don't do any

10   research for purposes of this case.

11          And, finally, remember that you must not talk about

12   anything with any person who's involved in the trial.  So if

13   you see Mr. Montoya or Mr. Mitchell or his staff or anyone else

14   outside and they're not speaking to you, they're doing exactly

15   what I told them to do.  They're not being rude, they're just

16   complying with the Court.  I don't want them talking to you

17   about anything, even if it doesn't have anything to do with the

18   trial.

19          If you need to speak with me about anything, simply

20   give a note to one of the court security officers or

21   Ms. Sanchez.

22          I may not repeat these every time we take a break

23   throughout the remainder of the day, but do keep them in mind

24   each time we take a break.

25          All right.  If you'll be back about 1:15, we'll try

```
 1   to get started and get the evidence completed this afternoon.

 2        (Jury out at 11:59 a.m.)

 3             THE COURT:  All right.  Anything we need to discuss

 4   before we take our break, Mr. Montoya?

 5             MR. MONTOYA:  Not at the present time.

 6             THE COURT:  All right.  If you'll take a look -- Do

 7   you have the typed version of the special verdict form?

 8             MR. MONTOYA:  The only one I recall seeing is not

 9   typed.  It's this one.

10             THE COURT:  All right.  I'll have Ms. Sanchez give

11   you the typed one.

12             Do you have a copy?

13             We'll get you a typed one, but it hasn't changed, so

14   maybe after lunch you'll give me your comments on that.

15             MR. MONTOYA:  Very well, Your Honor.

16             THE COURT:  All right.  We'll be in recess until

17   1:15.

18        (Court stood in recess at 11:59 a.m. and resumed at

19   1:18 p.m.

20             THE COURT:  While Ms. Sanchez is getting the jury

21   here, anything you want to tell me on the jury form,

22   Mr. Montoya?

23             MR. MONTOYA:  Your Honor, I've reviewed the verdict

24   form, the special verdict form, and I'm fine with most of it,

25   but not with paragraph 1, paragraph 2, and part of paragraph 3.
```

 1              THE COURT:  Are they ready?

 2              Well, let's talk about it a little bit later.  We'll

 3  go ahead and get the evidence in.

 4              MR. MONTOYA:  Certainly.

 5              THE COURT:  All right, Mr. Patterson, if you'll come

 6  back on up.

 7         (Jury in at 1:19 p.m.)

 8              THE COURT:  Mr. Patterson, I remind you, you're still

 9  under oath.

10              THE WITNESS:  Thank you, Your Honor.

11              THE COURT:  Mr. Montoya.

12              MR. MONTOYA:  Thank you, Your Honor.

13                   CONTINUED DIRECT EXAMINATION

14  BY MR. MONTOYA:

15  Q.   Before we go on and pick up where we left off, I want to

16  ask you about the discipline of economics and especially

17  forensic economics.  It's my understanding that there are

18  certain areas that economists don't testify about.  Is that

19  correct?

20  A.   Well, certainly.  There are a broad range of things we

21  don't testify about.

22  Q.   I'm sure.  Well, I guess we should say -- or I should say,

23  there are certain areas of damages in court cases that

24  economists don't testify about?

25  A.   That's correct.

1    Q.    And what are those areas?

2    A.    Well, particularly things like pain and suffering,

3    emotional distress.  Those kinds of things are something that

4    an economist just can't help with, and the reason is, we don't

5    have a market to go to.  I can't say, you know, this much pain

6    is worth so much money and I know that because people trade it.

7    It's unlike -- unlike the other items that I'm looking at,

8    mathematical expense, we know how that rises and falls in

9    value, earning capacity, household services, pleasure of life.

10   Those are fundamentally different because there are markets,

11   there's ways of us approaching that, there's information about

12   it.

13   Q.    But you are not saying, just because you don't testify

14   about pain and suffering, that it has no value?

15   A.    Oh, no, that's not my opinion at all.  It's just that I

16   can't really help the finders of fact determine value for

17   something like that.

18   Q.    Now, you listened to all of Mr. Mitchell's testimony --

19   A.    Yes.

20   Q.    -- including his testimony about pain and suffering, both

21   physical and emotional.  Is there any basis in the discipline

22   base of economics for you to disagree with his valuation of

23   pain and suffering?

24   A.    No.

25   Q.    And also no basis for you to agree?

1    A.    Correct.

2    Q.    I've put the easel there at what I hope is a convenient

3    location so that we can testify a little bit about your

4    calculations of damages.

5              MR. MONTOYA:  If the witness could step up to the

6    easel?

7              THE COURT:  He may.

8    Q.    (By Mr. Montoya)  Now, you did calculate lost earning

9    capacity, did you not, sir?

10   A.    Yes.  Well, I calculated the earning capacity on the basis

11   of the average earnings of male college graduates.

12   Q.    All right.  And what kinds of results did you obtain?

13   A.    Well, I started at the date of the entry and carried it

14   clear out through life expectancy, about age 77, and I

15   subtotaled it to two other important places.  I subtotaled it

16   to age 62, which is work-life expectancy.  It's a similar idea

17   to life expectancy.  Of all the 43-year-old men, when they

18   reach about age 62, I would expect half of them to still be at

19   work or to have retired or died.  That's the figure that I get

20   from the Department of Labor.

21   Q.    Okay.

22   A.    And I also subtotaled to age 65, which is normal

23   retirement.  In the statistical sense and in the colloquial

24   sense.  And I think those are important dates.  We as

25   economists believe people have the money earning capacity clear

1  out to their latest days, and some of us choose to exercise

2  their earning capacity clear out to our latest days.  Most of

3  us, however, choose at some point to forego that earning

4  capacity and take, instead, retirement, and for that reason I

5  subtotaled it.

6  Q.   All right.  For Mr. Mitchell, what kind of numbers were

7  you able to derive?

8  A.   Well, the present value of a 100 percent loss of earning

9  capacity for a person who had average earnings of a male

10  college graduate through about age 62, in his case, is

11  $1.69 million.  $1,686,875.  I'll round these to the nearest

12  thousand or so.

13  Q.   And that would be to age 62?

14  A.   That would be age 62.

15  Q.   Okay.  Can we put that one on the easel?

16  A.   Okay.  I'll just write here "Earning Capacity."  I

17  apologize in advance for my poor handwriting.  I'll put here

18  "Age 62."  And it comes to $1,686,875.

19  Q.   And that would be based on the assumption of an individual

20  of similar age who is completely deprived of his capacity to

21  earn money.  Is that right?

22  A.   That's right.  That would assume a hundred percent loss.

23  Q.   So that's not Mr. Mitchell?

24  A.   I don't think so.

25  Q.   It's kind of a benchmark?

1  A.   I think it's Mr. Mitchell.  I don't really know what he

2  can and can't still do in the way of earning money, but that

3  would be an individual who could not obtain any employment.

4  Q.   Okay.  And then you did a similar calculation to age 65

5  and got a larger number.

6  A.   Right.  To age 65, at present value, is about

7  $1.9 million, $1,925,895.

8  Q.   Okay.  And these are all at 100 percent loss-of-earning

9  capacity?

10  A.   That's right.

11  Q.   You calculated one more, to age 77.

12  A.   Yes.  If you go clear out to the age 77, his life

13  expectancy, present value is about $2,814,358.

14         And what I mean by these figures, to reiterate, is

15  that if we were to place in interest $1.68 million we could

16  withdraw each and every year the annual earnings of a male

17  college graduate and at the end of the 62nd year, which is

18  about -- that's 15 years into the future, we would have

19  withdrawn the entire sum of $1.68 million plus the interest

20  that that money earned at that period of time, and at the end

21  of age 62 our funds would be equal to zero.

22  Q.   So these figures are discounted to present value?

23  A.   They're discounted to present value.

24  Q.   Now let me ask you with respect to diminution of earning

25  capacity.  Is that just a straight mathematical -- If he lost

1   50 percent of his earning capacity, would it be half of those

2   figures?

3   A.   That's correct, it would be half of these figures.   50

4   percent loss of earning capacity to age 62 would be about

5   $840,000.

6   Q.   Okay.

7   A.   So it's half.

8   Q.   So if he lost a quarter of his earning capacity, it would

9   be like 25 percent of --

10  A.   Yeah, 25 percent of that figure would be about $421,000;

11  ten percent would be $168,687.   That's a straight line

12  function.

13  Q.   Very well, sir.   Go ahead and feel free to resume your

14  seat.

15  A.   Thank you.

16  Q.   I don't mean to have you standing up there all afternoon.

17          Are there other areas, Mr. Patterson, in which you

18  calculated Mr. Mitchell's damages?

19  A.   Yes.   I looked at loss of household services, I looked at

20  future medical expense, and I looked at value of pleasure of

21  life.

22  Q.   And we talked about future medicals this morning, I

23  believe.   Or did we not?   Is that the number?

24  A.   Well, we did discuss the present value of each thousand

25  dollars per year.   In addition, I did a calculation of the

1   present value of hip replacements on a ten-year schedule,

2   costing $15,000 for the first, $25,000 for the second, and

3   $40,000 for the third one.

4   Q.   Are you able to give a global figure for future meds?

5   A.   It's really going to be an issue for the finders of fact

6   in this matter.  First of all, you want to know on an annual

7   basis -- I heard testimony about prescription medications.  I

8   presume that there are checkups in addition to what a normal

9   uninjured person would get.

10   Q.   Okay.

11   A.   So the first issue for the finders of fact and jury will

12   be how many thousands of dollars per year do we expect him to

13   reasonably need over the course of his life expectancy.  And

14   then the second issue is, what will be the total cost of these

15   hip replacements, which we know have about a ten-year life

16   expectancy.

17   Q.   Now, you testified this morning that $36,133 is the

18   present value per thousand dollars over Mr. Mitchell's life

19   expectancy?

20   A.   Yes, sir.

21   Q.   That does not include the hip replacement cost?

22   A.   Well, no.  Those don't happen on an annual basis, though

23   you could try to schedule out 10/15ths of the $15,000, and then

24   10/25ths of the $25,000.  There are ways to do that.  But what

25   I did is just schedule those each ten years and determined the

1  present value.

2  Q.    Okay.  And what is the present value of the

3  hip-replacement surgery scheduled each ten years the way you

4  did it?

5  A.    The way I did it, it's about $97,048.

6  Q.    Okay.

7  A.    And by that figure I mean, if we place $97,048 in

8  interest, then in -- let's see -- in the year 2012, if we had a

9  hip replacement which in today's dollars cost $15,000, and then

10  in the year 2022 another hip replacement, which in today's

11  dollars costs $25,000, and then the year 2032, a third hip

12  replacement in today's dollars at $40,000, then we could place

13  that $97,000 in interest, make those withdrawals each of those

14  ten years, and after we pay for that last operation, the whole

15  $97,048 and the interest that it has earned would have been

16  consumed.

17  Q.    Okay.  So that $97,048 is discounted to present value?

18  A.    That's correct.

19  Q.    You mentioned that you also calculated loss of household

20  services.  How did you go about making such a calculation?

21  A.    Well, I calculated the present value of each one hour per

22  day of household service.  When economists talk about household

23  services, we're talking about all the things we do by way of

24  producing goods or services for ourselves and our family.  And

25  that would include things like, oh, cooking and cleaning and

1   doing the marketing, yard work, fixing flat tires on the car,

2   maybe doing spark plugs.

3            In other words, everybody is different about this,

4   and men and women are certainly different.  I know from some

5   government -- well, from a Cornell study, that was done and is

6   ongoing, that females not employed outside of the house with no

7   children spend on the average about 5.3 hours per day doing

8   household services and that men in a similar household do about

9   one hour of service.

10           Now, if a female works outside of the home it drops

11  down to about 4.1 hours a day.  We're talking seven days a week

12  here.  It's nothing that women on the jury don't know.  It's

13  something that men sometimes don't know.  But as the size of

14  the family goes up, and particularly with the age of the

15  children, then the number of hours per day rises for them.

16           For men, according to this study anyway, the average

17  number of hours per day, regardless of the family size,

18  averages right around one hour a day for a total of about seven

19  hours a week.  And, like I say, everyone is different.  Some of

20  us heat our houses with wood.  I heat my house with wood.  I

21  spent an hour this morning just chopping kindling, but not

22  everyone does that.

23           I don't know about Mr. Mitchell's situation, but I

24  would suspect on the average he would spend about an hour or a

25  little bit more per day doing his household services.  The

1  other thing I don't know is whether these injuries have

2  prevented him from doing all of his household services.   I

3  presume not.   But he did testify to weakness in his arm.   And

4  many people have a problem, then, carrying, say, groceries or

5  removing clothes from the washer to get them into the dryer.

6           And one of three things happens with household

7  services.   You know, either we get someone else to do it for

8  us -- we might pay them, or it might just be a friend or family

9  member -- we do them ourselves and compensate somehow, perhaps

10 smaller loads of groceries, load half as much in each bag, make

11 twice as many trips.   The third thing that can happen is it

12 just doesn't get done.

13          The way I calculated the value is each one hour per

14 day at the prevailing minimum wage, and I utilized the Santa Fe

15 minimum wage.   And the present value of one hour per day of

16 this kind of service in that way is $103,643.

17 Q.   And again, that is spread out over the rest of

18 Mr. Mitchell's expected life?

19 A.   If we placed in interest $103,000, paid him back for a few

20 years since the injury and placed the balance back at interest,

21 we could withdraw one hour a day of the Santa Fe minimum wage

22 each and every day until he is in the 77th year and the funds

23 would be equal to zero.

24 Q.   Now, you also calculated a value for the lost value of the

25 pleasure of life.   How does an economist approach such a

1    calculation?

2    A.    Well, what I did was I calculated the present value of

3    each $10,000 per year lost value of the pleasure of life.  And

4    it's a benchmark again, like my one hour per day of household,

5    a thousand dollars per year of medical expense.  We economists

6    have a number of studies done in the public and the private

7    sector about how we as a society value lives, and just a

8    rougher thumbnail sketch of how we do that is, there are four

9    basic areas.

10          One is we know, as economists, in the labor market

11    that you have to pay people a little bit more money to take on

12    jobs that are risky.  For instance, we pay firefighters,

13    policemen and underground miners more money than we pay

14    maintenance and plumber people, security folks, and heavy

15    equipment operators, even though those jobs are kind of similar

16    in educational and exertional requirements.  And that is

17    compensation for an added risk of losing your life of injury or

18    loss of life.  I call those the labor studies.

19          The other way of looking at this is, for instance,

20    safety improvements, somewhere in here there's a smoke alarm,

21    there's a smoke alarm in every room of every building that's

22    been built over the last 10 or 20 years.  If we had the value

23    of all the smoke alarms and find out the lives saved and the

24    ages of those lives, then we determine how we're valuing lives

25    in terms of smoke alarms.  You can do the same thing with child

 1    safety seats and automobiles.

 2            The third way to look at it is, how do our government

 3    agencies who have to do these risk benefit/cost benefit

 4    analyses -- how does that shape out?  And if you look at the

 5    Federal Aviation Administration, for instance, they value lives

 6    right at about $850,000 to $1 million, which is to say, if you

 7    have a safety improvement for aircraft that cost less than

 8    $1 million, if it saves at least one life, that improvement is

 9    likely to be put into service.  But if it's more expensive than

10    that, then it's not likely to be done.

11            If you look at the Environmental Protection Agency

12    rules about fine particulate smoke, the diesel rules that we've

13    just adopted, those rules cost about $12 million for each life

14    saved.  The OSHA rules about climbing on high roofs, we no

15    longer use a run-up ladder and work on the roof.  There's

16    supervisors' safety meetings, harnesses, climbing ropes, and a

17    lot of other things involved.  Those also cost about

18    $12 million for each life that's saved.

19            So that is the way that we economists look at total

20    whole values of lives.  And under those schemes, I utilized a

21    study that was done first back in the '80s by Ted R. Miller,

22    and he looked at -- he looked at 60 or 70 of these different

23    types of studies and then averaged them, and in today's dollars

24    we economists believe that our society values lives at about

25    $100,000 per year.

1          So in the case of complete loss of the value of

2    pleasure of life I would say that the value of that's a hundred

3    thousand per year, but I don't think Mr. Mitchell has lost a

4    hundred percent of that, so, again, I make this $10,000 per

5    year benchmark, which represents about a 10 percent loss to the

6    value and pleasure of life, the present value of which is about

7    $363,000.

8    Q.   And again, that is discounted to present value and the

9    figure represents spread over the remainder of Mr. Mitchell's

10   years?

11   A.   That's right.  And what we're talking about here, if we

12   look at -- May I use the board again to draw a little graph?

13          MR. MONTOYA:  With your permission, Your Honor?

14          THE COURT:  You may.

15          THE WITNESS:  Thank you, Your Honor.

16   A.   If you were to make a pie chart of a 24-hour day, and this

17   would be a Monday through Friday during your work lifetime of

18   day, then we could split that into about three pieces, equal

19   thirds, and there would be about eight hours of sleep and about

20   eight hours of work.  There's a little sliver of time here when

21   we're doing our chores and household service.  So what we're

22   trying to value is this rest of our time.  And I think of it as

23   the time we're working for and living for.  It would be the

24   time that we're engaging in whatever pleasurable activities we

25   engage in.  And everybody's different.  So some of us spend

1   time with our families, some of us play sports.

2          I understand that Mr. Mitchell was an athletic person

3   before, that he walked, that he worked out with weights and can

4   no longer do those kinds of things, so I would believe that

5   those kinds of activities fall into this part of our time, and

6   that's what we're attempting to value there.  Not the time

7   we're sleeping, not the time we're working, not the time that

8   we're doing our household service, but that time that we're

9   working for.

10  Q.   Mr. Patterson, we have spoken about your estimations on

11  lost income, the loss of household services, the value of

12  future hip replacements.  And let me just ask you, the

13  $97,048 -- does that include the one that he's already had, or

14  is that just including ones in the future?

15  A.   No.  Those would be future ones.

16  Q.   Okay.

17  A.   And he testified today to a higher figure.  I just don't

18  know.  Originally, I had done this on the basis of $15,000,

19  $25,000, and $40,000.  If they're -- You know, if it's

20  particularly complicated, I just don't know.  I can't speculate

21  about that.  I won't do it if I don't know.

22  Q.   But you did see the medical expense summary from the

23  original gunshot wound and all the care that went into that,

24  which included not only the hip replacement, but also the other

25  repairs, and that was $50,502.16?

1    A.    Yes.   That's his past medical expense.

2    Q.    Okay.   And you've talked about your calculations on the

3    lost value of the pleasure of life, which if valued at $10,000

4    a year for the rest of his life would be $363,245 in

5    present-day dollars?

6    A.    That's correct, yes, sir.

7    Q.    What you're not saying is that it's only at $10,000 a

8    year?

9    A.    Right.   It is only $10,000 per year, and that figure is a

10   benchmark or an aid for you.   It can be used both directions.

11   If you believe that the loss is $50,000 per year, then we'd

12   multiply that $363,000 times five.   Five times 10,000.   If you

13   believe it's only $5,000 a year, then it would be half of this

14   $363,000, but it's completely an issue --

15   Q.    So that's a linear function, just like the lost income?

16   A.    That's correct.

17   Q.    All right, sir.   Have you calculated damages in any other

18   areas that we've not touched on?

19   A.    No, sir.

20   Q.    Okay.   And economists don't calculate punitives, either,

21   do they?

22   A.    No.   That's really an issue -- All of these are issues for

23   the finders of fact.   My job here is to act as an aid to the

24   finders of fact, and I can't really be of aid in that case.

25   Q.    But what you can be of aid and you have been of aid to us

```
 1   in is in explaining some of the benchmarks and the standards
 2   that are recognized in the discipline of economics --
 3   A.    I hope so.
 4   Q.    -- and how they apply to Mr. Mitchell?
 5   A.    Yes, sir.
 6   Q.    Thank you very much, sir.
 7              MR. MONTOYA:  No further questions.
 8              THE COURT:  Thank you, Mr. Montoya.
 9              Mr. Patterson, you may step down.  Thank you for your
10   testimony.
11              THE WITNESS:  Thank you, Your Honor.
12              THE COURT:  Mr. Montoya, does the plaintiff have any
13   further witnesses or evidence?
14              MR. MONTOYA:  The plaintiff rests at this point.
15              THE COURT:  All right.  Thank you, Mr. Montoya.
16              Members of the jury, you have now heard all of the
17   evidence in the case.
18              It becomes my duty, therefore, to instruct you on the
19   rules of law that you must follow and apply in arriving at your
20   decision in the case.
21              In any jury trial, there are in effect two judges.  I
22   am one of the judges.  The other is the jury.  It is my duty to
23   preside over the trial and to determine what evidence is
24   relevant under the law for your consideration.  It is also my
25   duty, at the end of the trial, to instruct you on the law
```

1    applicable to the case.

2            You, as jurors, are the judges of the facts.  But in

3    determining what actually happened in this case -- that is, in

4    reaching your decision as to the facts -- it is your sworn duty

5    to follow the law I am now in the process of defining for you.

6            And you must follow all of my instructions as a

7    whole.  You have no right to disregard or give special

8    attention to any one instruction, or to question the wisdom or

9    correctness of any rule I may state to you.  That is, you must

10   not substitute or follow your own idea or opinion as to what

11   the law is or ought to be.  It is your duty to apply the law as

12   I give it to you, regardless of the consequences.

13           By the same token, it is also your duty to base your

14   verdict solely upon the evidence in the case, without prejudice

15   or sympathy.

16           This case should be considered and decided by you as

17   an action between persons of equal standing in the community,

18   of equal worth in holding the same or similar stations in life.

19   All persons stand equal before the law and are to be dealt with

20   as equals in a court of justice.  It is a general rule in civil

21   cases that a party seeking a recovery has the burden of proving

22   every essential element of its claim by a preponderance of the

23   evidence.  To prove by a preponderance of the evidence means to

24   establish that something is more likely true than not true.

25   When I say in these instructions that a party has the burden of

1   proof, I mean that you must be persuaded that what is sought to

2   be proved is more probably true than not true.  Evenly balanced

3   evidence is not sufficient.

4           As stated earlier, it is your duty to determine the

5   facts, and in so doing, you must consider only the evidence I

6   have admitted in the case.  The term "evidence" includes the

7   sworn testimony of the witnesses and the exhibits admitted in

8   the record.

9           Remember that any statements, objections or arguments

10  by the lawyers are not evidence in the case.  The function of

11  lawyers is to point out those things that are most significant

12  or most helpful to their side of the case, and, in so doing, to

13  call your attention to certain facts or inferences that might

14  otherwise escape your notice.

15          In the final analysis, however, it is your own

16  recollection and interpretation of evidence that controls in

17  the case.  What lawyers say is not binding upon you.

18          So, while you should consider only the evidence in

19  the case, you are permitted to draw such reasonable inferences

20  from the testimony and exhibits as you feel are justified in

21  the light of common experience.  In other words, you may make

22  deductions and reach conclusions which reason and common sense

23  lead you to draw from the facts which have been established by

24  the testimony and evidence in the case.

25          You may consider either direct or circumstantial

1  evidence.  Direct evidence is the testimony of one who asserts

2  actual knowledge of a fact, such as an eyewitness.

3  Circumstantial evidence consists of proof of facts or

4  circumstances which give rise to a reasonable inference of the

5  truth of the fact sought to be proved.  The law makes no

6  distinction between the weight to be given to either direct or

7  circumstantial evidence.

8         Now, I have said that you must consider all the

9  evidence.  This does not mean, however, that you must accept

10  all the evidence as true or accurate.

11         You are the sole judges of the credibility or

12  believability of each witness and the weight to be given to the

13  witness's testimony.  In weighing the testimony of a witness,

14  you should consider the witness's relationship to the plaintiff

15  or to the defendant, the witness's interest, if any, in the

16  outcome of the case, manner of testifying, opportunity to

17  observe or acquire knowledge concerning the facts about which

18  the witness testified; candor, fairness and intelligence; and

19  to the extent to which the witness has been supported or

20  contradicted by other credible evidence or previous statements

21  inconsistent with the witness's previous testimony.  You may,

22  in short, accept or reject the testimony of any witness in

23  whole or in part.

24         Also, the weight of the evidence is not necessarily

25  determined by the number of witnesses testifying as to the

1   existence or nonexistence of any fact.  You may find that the

2   testimony of a smaller number of witnesses as to any fact is

3   more credible than the testimony of a larger number of

4   witnesses to the contrary.

5          An expert witness is permitted to state an opinion

6   based upon a question which, for the purposes of trial, assumes

7   as true certain facts which may or may not be true.

8          It will be for you to determine -- It will be for you

9   in your deliberations, however, to determine from all of the

10  evidence whether or not the facts assumed have been proved to

11  be true.

12         The rules of evidence provide that if scientific or

13  technical or other specialized knowledge might assist you in

14  understanding the evidence, in determining a fact in issue, a

15  witness qualified as an expert by knowledge, skill, experience,

16  training or education may testify and state an expert opinion

17  concerning such matters.

18         You should consider each expert opinion received in

19  evidence in this case and give it such weight as you think it

20  deserves.  You should -- If you should decide that the opinion

21  of an expert witness is not based upon sufficient education and

22  experience, or if you should conclude that the reasons given in

23  support of the opinion are not sound or that the opinion is

24  outweighed by other evidence, then you may disregard the

25  opinion entirely.

1          An attorney has the right to interview a witness for

2     the purpose of learning what testimony the witness will give.

3     The fact that the witness has talked to an attorney does not

4     reflect adversely on the truth of such testimony.

5          Certain charts and summaries have been shown to you

6     in order to help explain the facts disclosed by the books,

7     records and other documents which are in evidence in the case.

8     Such charts or summaries are used for convenience.  They are

9     not themselves evidence or proof of any facts.  If they do not

10    correctly reflect the facts or figures shown by the evidence in

11    the case, you should disregard these charts and summaries and

12    determine the facts from the underlying evidence.

13         A proximate cause of damages is that which, in a

14    natural and continuous sequence, produces the damages and

15    without which the damages would not have occurred.  It need not

16    be the only cause nor the last nor nearest cause.  It is

17    sufficient if it occurs with some other cause acting at the

18    same time which in combination with it causes the damages.

19         You are to engage in a discussion of damages.  You

20    need not determine that there is liability.  This is a case

21    where Mr. O'Brien is liable on Mr. Mitchell's claim.  You must

22    determine the damages, if any, to which Mr. Mitchell is

23    entitled.

24         It is the duty of the Court to give instructions as

25    to the measure of damages.  The fact that you are given

1   instructions on damages, however, is not to be taken as an

2   indication as to whether the Court thinks damages should or

3   should not be awarded.

4         Damages must be reasonable.  If you should find that

5   Mr. Mitchell is entitled to a verdict, you may award only those

6   damages which will reasonably compensate him for the injuries

7   that he has sustained as a proximate result of Mr. O'Brien's

8   conduct.

9         You are not permitted to award speculative damages,

10  so you are not to include in any verdict compensation for any

11  prospective loss which, although possible, is not reasonably

12  certain to occur in the future.

13        You must determine an amount that is fair

14  compensation for all of Mr. Mitchell's damages.  These damages

15  are called compensatory damages.  The purpose of compensatory

16  damages is to make Mr. Mitchell whole; that is, to compensate

17  Mr. Mitchell for the damage that he has suffered.  Compensatory

18  damages are not limited to expenses that Mr. Mitchell may have

19  incurred because of his injury.  If Mr. Mitchell wins, he is

20  entitled to compensatory damages for the physical injury, pain

21  and suffering, mental anguish, shock and discomfort that he has

22  suffered because of Mr. O'Brien's conduct.

23        You may award compensatory damages only for injuries

24  that Mr. Mitchell proves were proximately caused by

25  Mr. O'Brien's allegedly wrongful conduct.  The damages that you

1    award must be fair compensation for all of Mr. Mitchell's

2    damages, no more and no less.  Compensatory damages are not

3    allowed as a punishment and cannot be imposed or increased to

4    penalize Mr. O'Brien.  You should not award compensatory

5    damages for speculative injuries, but only for those injuries

6    which Mr. Mitchell has actually suffered or that Mr. Mitchell

7    is reasonably likely to suffer in the future.

8         If you decide to award compensatory damages, you

9    should be guided by dispassionate common sense.  Computing

10   damages may be difficult, but you must not let that difficulty

11   lead you to engage in arbitrary guesswork.  On the other hand,

12   the law does not require that Mr. Mitchell prove his amount of

13   loss with mathematical precision, but only with as much

14   definiteness and accuracy as the circumstances permit.  You

15   must use sound discretion in fixing an award of damages,

16   drawing reasonable inferences where you find them appropriate

17   from the facts and circumstances in evidence.

18        You should consider the following elements of damages

19   to the extent you find them proved by a preponderance of the

20   evidence.  One, calculation of past and future damages.  A, the

21   damages accrued.  Mr. Mitchell is entitled to recover an amount

22   that will fairly compensate him for any damages he has suffered

23   to date.

24        The calculation of future damages.  If you find that

25   Mr. Mitchell is reasonably certain to suffer damages in the

1   future from his injuries, then you should award him the amount

2   you believe would fairly compensate him for such future

3   damages.   In calculating future damages, you should consider

4   the standard table of mortality.

5         C, a reduction of future damages to present value.

6   An award of future damages necessarily requires that payment be

7   made now for a loss that Mr. Mitchell will not actually suffer

8   until some future date.   If you should find that Mr. Mitchell

9   is entitled to future damages, including future earnings, then

10   you must determine the present worth in dollars of such future

11   damages.   If you award damages for loss of future earnings, you

12   must consider two particular factors:   One, you should reduce

13   any award by the amount of the expenses that Mr. Mitchell would

14   have incurred in making those earnings; two, if you make an

15   award of future loss of earnings, you must reduce it to present

16   value by considering the interest that Mr. Mitchell could earn

17   on the amount of the award if he made a relatively risk-free

18   investment.   The reason why you must make this reduction is

19   because an award of an amount representing future loss of

20   earnings is more valuable to Mr. Mitchell if he receives it

21   today than if he received it in the future, when he would

22   otherwise have earned it.   It is more valuable because

23   Mr. Mitchell can earn interest on it for the period of time

24   between the date of the award and the date he would have earned

25   the money.   Thus, you should adjust the amount of any award for

1    future loss of earnings by the amount of interest that

2    Mr. Mitchell can earn on that amount in the future.

3            If you make any award for future medical expenses,

4    you should adjust or discount the award to present value in the

5    same manner as with loss of future earnings.

6            However, you must not make any adjustment to present

7    value for any damages you may award for future pain and

8    suffering or future mental anguish.

9            Two, injury, pain, disability, disfigurement, loss of

10   capacity for enjoyment of life.  You may award damages for any

11   bodily injury that Mr. Mitchell sustained and any pain and

12   suffering, disability, disfigurement, mental anguish, and/or

13   loss of capacity for enjoyment of life that Mr. Mitchell

14   experienced in the past or will experience in the future as a

15   result of the bodily injury.

16           No evidence of the value of intangible things, such

17   as mental or physical pain or suffering, has been or need be

18   introduced.  You are not trying to determine value, but an

19   amount that will fairly compensate Mr. Mitchell for the damages

20   he has suffered.  There is no exact standard for fixing the

21   compensation to be awarded for these elements of damage.  Any

22   award you make should be fair in light of the evidence.

23           Three, aggravation or activation of disease or

24   defect.  You may award damages for aggravation of an existing

25   disease or physical defect or activation of any such latent

1   condition resulting from the physical injury to Mr. Mitchell.

2   If you find that there was such an aggravation, you should

3   determine, if you can, what portion of Mr. Mitchell's condition

4   resulted from the aggravation and make allowance in your

5   verdict only for the aggravation.

6         Four, medical expenses.  The reasonable value and/or

7   expense of hospitalization and medical and nursing care and

8   treatment that Mr. Mitchell will require because of his

9   injuries, which were caused by Mr. O'Brien's wrongful conduct.

10        And, five, lost earnings, time, earning capacity.

11  Any earnings lost, any working time, and any loss of ability to

12  earn money sustained in the past and any such loss in the

13  future.

14        If you have found that Mr. Mitchell is entitled to

15  damages arising in the future, you must determine the amount of

16  such damages.

17        If these damages are of a continuing nature, you may

18  consider how long they will continue.

19        As to loss of future earning ability, you may

20  consider that some persons work all their lives and others do

21  not and that a person's earnings may remain the same or may

22  increase or decrease in the future.

23        According to the table of mortality, the life

24  expectancy of Mr. Mitchell is 29.9 additional years.  This

25  figure is not conclusive.  It is the average life expectancy of

1   persons who have reached that age.  This figure may be

2   considered by you in connection with other evidence relating to

3   the probable life expectancy of Mr. Mitchell, including

4   evidence of Mr. Mitchell's occupation, health, habits and other

5   activities, bearing in mind that some persons live longer and

6   some shorter than the average.

7          If you find that Mr. Mitchell should recover

8   compensation for damages and if you further find that the

9   conduct of Mr. O'Brien was malicious, willful, reckless,

10  wanton, fraudulent or in bad faith, then you may award punitive

11  damages against Mr. O'Brien.  Punitive damages are awarded for

12  the limited purposes of punishment and to deter others from the

13  commission of like offenses.

14         The amount of punitive damages must be based on

15  reason and justice, taking into account all the circumstances,

16  including the nature of the wrong and such aggravating and

17  mitigating circumstances as may be shown.  The amount awarded,

18  if any, must be reasonably related to the actual damages and

19  injury and not disproportionate to the circumstances.

20         Malicious conduct is the intentional doing of a

21  wrongful act with knowledge that the act was wrongful.

22         Willful conduct is the intentional doing of an act

23  with knowledge that harm may result.

24         Reckless conduct is the intentional doing of an act

25  with utter indifference to the consequences.

1          And wanton conduct is the doing of an act with utter

2    indifference to or conscious disregard for a person's rights or

3    safety.

4          Faithful performance by you of your duties is vital

5    to the administration of justice.

6          Any verdict must represent the considered judgment of

7    each juror.  In order to return a verdict, it is necessary that

8    each juror agree to it.  In other words, your verdict must be

9    unanimous.

10          It is your duty, as jurors, to consult with one

11    another and to deliberate in an effort to reach an agreement if

12    you can do so without giving up your individual judgment.  Each

13    of you must decide the case for yourself, but only after an

14    impartial consideration of all the evidence in the case with

15    your fellow jurors.

16          In the course of your deliberations, do not hesitate

17    to re-examine your own views and change your opinion, if

18    convinced it is erroneous, but do not surrender your honest

19    conviction as to the weight or effect of the evidence solely

20    because of the opinion of your fellow jurors or for the mere

21    purpose of returning a verdict.

22          Remember at all times, you are not partisans.  You

23    are judges, judges of the facts.  Your sole interest is to seek

24    the truth in evidence in the case.

25          Upon retiring to the jury room, you should first

1   elect a foreperson, who will preside over your deliberations

2   and will be your spokesperson here in court.

3          A form of verdict has been prepared for your

4   convenience.  You should take the verdict form to the jury

5   room, and when you have reached a unanimous agreement as to

6   your verdict, you will have your foreperson fill in, date and

7   sign it and then return to the courtroom.

8          If, during deliberations, you should desire to

9   communicate with me, please put your message or question in

10  writing, signed by the foreperson, and pass the note to the

11  court security officer, who will bring it to my attention.  I

12  will then respond as promptly as possible, either in writing or

13  by having you return to the courtroom.  I caution you, however,

14  with regard to any message or question you might send, that you

15  should never state your numerical division.

16         Mr. Montoya, if you'll come up here to the bench for

17  just a second.

18      (Bench conference on the record.)

19         THE COURT:  Any objections to the charge or

20  additional charges, other than what we've already discussed?

21         MR. MONTOYA:  No, sir.

22         THE COURT:  All right.  Are you ready for closing?

23         MR. MONTOYA:  I'm ready.  Thank you.

24         THE COURT:  All right.

25      (Open court.)

```
 1              THE COURT:  All right, Mr. Montoya, are you ready for
 2   a closing argument on behalf of the plaintiff?
 3              MR. MONTOYA:  I am, Your Honor.  Thank you.
 4              THE COURT:  Mr. Montoya.
 5        (Closing argument not included in transcript.)
 6              THE COURT:  Thank you, Mr. Montoya.
 7              All right.  The jury may go to the jury room and
 8   commence its deliberations.
 9        (Jury out to deliberate at 2:21 p.m.)
10              THE COURT:  All right.  All right, Mr. Montoya, let's
11   get your changes to the verdict form here.
12              MR. MONTOYA:  As soon as I find it.
13              THE COURT:  All right.
14              MR. MONTOYA:  I have it right here, Your Honor.
15              Question number 1 says, "Did Defendant Dennis
16   O'Brien's conduct cause damage to plaintiff Walter Mitchell."
17   We believe that is the liability question and it's already been
18   answered in the affirmative; consequently, question number 2,
19   "If you answered yes to question number 1," question number 1
20   we propose should be out.  Question number 2 should be modified
21   and should basically be question number 1.
22              3 and 4 are quite appropriate.
23              THE COURT:  Well, I've thought about that, and, you
24   know, you and I talked a little bit about this.  On the final
25   instructions about the causation one, it seems to me that we
```

1   first ought to get an answer whether they caused any damages to

2   him and -- you know, I think there's sufficient evidence in the

3   record for the jury to do that.  But, I don't know.  It's a

4   little bit of -- it's a borderline area there.  I think I'll

5   leave the verdict form the way it is.  If something happens

6   that we need to reconsider it, then we can reconsider it if

7   they come back.  And I may try to get an answer in something.

8   But I think I'll make them answer this question first, and then

9   we'll see if it creates any problems.

10          MR. MONTOYA:  Thank you, Your Honor.

11          THE COURT:  This one's fine.  And I didn't

12   double-check all the -- making sure if they answer yes they

13   move to no, but I assume you took a look at that and that's

14   okay, so I'll go with that.

15          Let's determine what exhibits are going to be sent to

16   the jury room.  You had one, Mr. Montoya, on your computer.

17          MR. MONTOYA:  I did, and that is on this compact

18   disc.

19          THE COURT:  Just give them the disc?  Okay.

20          MR. MONTOYA:  Everything else is pretty much on

21   paper.  They might make use of some sort of lighting source to

22   view the X-rays.

23          THE COURT:  We'll just give them to them, and if they

24   want something, we'll do it.

25          And do we have the jury instructions?  We did show

1    Mr. Montoya the final set.  There was a little bit of change on

2    the actuarial number and there was -- there was that.  Was that

3    done?

4            MS. SANCHEZ:  I didn't do it.

5            THE COURT:  Let me show you, Mr. Montoya, to make

6    sure these are right.  It's what I read.

7            MR. MONTOYA:  29.9.

8            THE COURT:  Whatever I read was right.

9            MR. MONTOYA:  And that would be consistent with

10   Mr. Patterson's testimony.

11           THE COURT:  This is what I read on number 19.  I had

12   a return to the courtroom, and I think it should just be return

13   to the courtroom.  That's the way I read it.  I wanted to make

14   sure you saw the changes.

15           MR. MONTOYA:  That will be fine, Your Honor.

16           THE COURT:  I think that's all I did, other than that

17   actuarial number.  And that was all right with you?

18           MR. MONTOYA:  Yes, sir.

19           THE COURT:  All right.  All right.  And, Ms. Sanchez,

20   if you'll give the exhibits to the jury and then each one will

21   get a set of the instructions, but only one verdict form.

22           Is that agreeable, Mr. Montoya?

23           MR. MONTOYA:  Yes, Your Honor.

24           THE COURT:  All right.  Mr. Montoya, you don't have

25   to hang around -- you've done this with me a number of times --

1    but if you want to leave Ms. Sanchez a telephone number, we'll

2    give you a call when the jury comes back.  If you want to stick

3    around, you're welcome to do that.

4            MR. MONTOYA:  We'll probably stay around for a little

5    while, Judge.  Thank you, sir.

6            THE COURT:  If you do decide to leave, just give

7    Ms. Sanchez some number that we can reach you pretty quick.

8            Anything else before we take our recess?

9            MR. MONTOYA:  Nothing further at this time.

10           THE COURT:  All right.  Thank you, Mr. Montoya.

11           I'm going to kind of get organized here, so don't pay

12   any attention to me.

13      (Court stood in recess at 2:27 p.m. and resumed at

14       3:27 p.m. as follows:)

15           THE COURT:  All right.  We've received a note from

16   the jury.  It says, "Your Honor, we have reached a verdict,"

17   dated at Albuquerque on December 10th, 2007, at 3:17 p.m.  The

18   note appears to be signed by Adam Ross, juror number 4, on the

19   front row, the one at the end.  That appears to be the

20   signature.

21           I'll ask Ms. Sanchez to attach the note from the jury

22   as Exhibit A to her clerk's minutes.

23           Are all the interested parties, other than the jury,

24   convened here in open court and ready to receive the verdict,

25   Mr. Montoya?

1          MR. MONTOYA:  Yes, sir.

2          THE COURT:  It appears the jury is ready to return

3   the verdict.  I'll have Ms. Sanchez have the jury enter and

4   resume their seats in the jury box in the order in which they

5   have sat throughout the trial.

6      (Jury in at 3:30 p.m.)

7          THE COURT:  All right.  I've received a note from the

8   jury indicating that the jury has reached a verdict.

9          Mr. Ross, are you speaking for the jury?

10         MR. ROSS:  Yes, sir.

11         THE COURT:  Was that your signature at the bottom,

12  and you are the jury's foreperson?

13         MR. ROSS:  (Nodded head.)

14         THE COURT:  And has, Mr. Ross, the jury unanimously

15  agreed on its verdict?

16         MR. ROSS:  Yes, sir.

17         THE COURT:  All right.  If you would hand the verdict

18  form to Ms. Sanchez.

19         All right.  Mr. Ross, I'm going to hand this back to

20  you and ask you to date the form, if you would.  If you'll do

21  that in your own signature.

22         All right.  I will now publish your verdict by

23  reading it aloud in open court.  The jury should pay close

24  attention as the verdict is published.  Following publication,

25  I am going to poll the jury.  And what that means is that each

1   juror may be asked -- or will be asked individually whether the

2   verdict as published constitutes his or her individual verdict

3   in all respects.

4          Question number 1:  "Did Defendant Dennis O'Brien's

5   conduct cause damage to Plaintiff Walter Mitchell?"

6          Answer:  "Yes."

7          Question number 2:  "If you answered yes to question

8   number 1, please state the amount of compensatory damages, if

9   any, to which Mr. Mitchell is entitled."

10         And the jury has written into the blank $2,500,000.

11         3:  "If you have put any amount in your answer to

12   question number 2, please state whether Mr. Mitchell is

13   entitled to any punitive damages from Mr. O'Brien."

14         The jury has answered:  "Yes."

15         Question number 4:  "If you answered yes to question

16   number 3, please state the amount of punitive damages, if any,

17   to which Mr. Mitchell is entitled."

18         And the jury has filled in that blank with the figure

19   $500,000.

20         And then it states:  "The foregoing answers

21   constitute your special verdict," dated this 10th day of

22   December, 2007, signed by the jury foreperson, Mr. Adam Ross,

23   on December 10th, 2007.

24         I'm going to poll the jury here.  Ms. Arrighetti,

25   does the verdict as published by the Court constitute your

1    individual verdict in all rats.

2              MS. ARRIGHETTI:  Yes.

3              THE COURT:  And, Ms. Gallegos, does the verdict as

4    published by the Court constitute your individual verdict in

5    all respects?

6              MS. GALLEGOS:  Yes, sir.

7              THE COURT:  And, Ms. Dalton, does the verdict as

8    published by the Court constitute your individual verdict in

9    all respects?

10             MS. DALTON:  Yes.

11             THE COURT:  Mr. Ross, does the verdict as published

12   by the Court constitute your individual verdict in all

13   respects?

14             MR. ROSS:  Yes, sir.

15             THE COURT:  Mr. Neel, does the verdict as published

16   by the Court constitute your individual verdict in all

17   respects?

18             MR. NEEL:  Yes, sir.

19             THE COURT:  Ms. Culver, does the verdict as published

20   by the Court constitute your verdict in all respects?

21             MS. CULVER:  Yes, sir.

22             THE COURT:  And, Mr. Gordon, does the verdict as

23   published by the Court constitute your individual verdict in

24   all respects?

25             MR. GORDON:  Yes, sir.

1          THE COURT:  All right.  I'm going to ask Ms. Sanchez

2     to file and record the verdict.

3          Ladies and gentlemen, the jury is now discharged.  I

4     want to thank you for your service.  You did everything that we

5     asked you to do and you've been a good bunch to work with and I

6     appreciate all you've done.

7          I'm going to meet with Mr. Montoya for just a moment,

8     but in the meantime, if you have a moment -- you're free to go

9     if you need to go somewhere.  I know some of you have traveling

10    to do, and if you want to go, you're welcome to leave, but if

11    you have a moment, I'd like for you to come up to my chambers,

12    and I have a certificate to give you for your service today and

13    to thank you personally for your service.  If I don't see you

14    again, again, thank you for your service, and I appreciate all

15    you've done for the Court and your work today.  But if you have

16    a moment, I'd like to see you in my chambers, and I'll ask the

17    court security officer to take you up there when we're done.

18         All right.  You are discharged.

19       (Jury out at 3:36 p.m.)

20         THE COURT:  I'm going to meet with the jury and thank

21    them for their service, Mr. Montoya.  If you wish to come up,

22    as counsel, you're welcome to come up and talk to the jury.  If

23    not, then don't feel any obligation to do so, but you're

24    welcome to talk to them if you would like.

25         MR. MONTOYA:  I would ask that Your Honor express our

1    thanks for their good service, and I've got folks waiting to

2    talk to me back at the office.

3              THE COURT:  I understand.

4              What do you wish to do with the case now?  Do you

5    want to think about it, or are you prepared to dismiss your

6    claim against the County and me enter final judgment on this,

7    or what would you like to do?

8              MR. MONTOYA:  I think that we will do that, but I

9    would ask that Your Honor give me until Friday of this week.

10             THE COURT:  All right.

11             MR. MONTOYA:  And I will notify Ms. Sanchez.

12             THE COURT:  All right.  I'll just enter a verdict in

13   on the defendant that we have and on the amount that we have,

14   and then I'll wait on doing anything further with the case

15   until the end of the week.

16             MR. MONTOYA:  Very well, sir.

17             THE COURT:  Anything else we need to take up?

18             MR. MONTOYA:  Nothing further.  I want to thank you,

19   Your Honor, for doing an excellent job with the logistics in

20   presiding over the trial.  It's the first time I've ever gotten

21   through an entire jury trial in one day, other than maybe once

22   in metro court.

23             THE COURT:  I actually have done it before in

24   criminal cases down in Las Cruces.  It is a little unusual to

25   get one done so quickly, but down there I've had some -- I

1    don't know if it was immigration cases or gun cases or drug

2    cases, but I actually picked a jury and got it done in a day.

3    But it's a little different feeling, isn't it?

4              MR. MONTOYA:  I've done plenty of two-day, but not

5    very many.  And certainly in federal court it's a first.

6              THE COURT:  They're pretty rare.  Thank you for your

7    assistance.

8              We'll be in recess.

9         (Court stood in recess at 3:38 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2          EXAMINATION                              PAGE

3    WITNESS:  WALTER MITCHELL

4          Direct Examination by Mr. Montoya          12

5    WITNESS:  WILLIAM PATTERSON

6          Direct Examination by Mr. Montoya          52
           Continued Direct Examination By Mr. Montoya  64
7

8               EXHIBITS ADMITTED INTO EVIDENCE

9
     Plaintiff's Exhibit 1                            16
10   Plaintiff's Exhibit 2                            28
     Plaintiff's Exhibit 3                            32
11   Plaintiff's Exhibit 4                            37

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    Danna Schutte Everett
           Official United States Court Reporter
                333 Lomas Boulevard, Northwest
                      (505) 348-2283

1                         C-E-R-T-I-F-I-C-A-T E

2    UNITED STATES OF AMERICA

3    DISTRICT OF NEW MEXICO

4

5         I, Danna Schutte Everett, RPR, CCR, CRR, Official

6    Court Reporter for the State of New Mexico, do hereby

7    certify that the foregoing pages constitute a true

8    transcript of proceedings had before the said Court held

9    in the City of Albuquerque, New Mexico, in the matter

10   therein stated.

11        In testimony whereof, I have hereunto set my hand on

12   this 28th day of May, 2010.

13

14                   _____

                     DANNA SCHUTTE EVERETT
15                   Registered Professional Reporter
                     Registered Merit Reporter
16                   Certified Realtime Reporter
                     NM Certified Court Reporter #139
17                   333 Lomas Boulevard, Northwest
                     Albuquerque, New Mexico  87102
18                   Phone:  (505) 348-2283
                     Fax:  (505) 348-2285
19

20

21

22

23

24   December 10, 2007, Mitchell vs. The County of Santa Fe

25